369 A.2d 1277
**COMMONWEALTH of Pennsylvania**
v.
**Adam Andrew TOPA, Appellant.**

Supreme Court of Pennsylvania.

Argued April 7, 1975.

Decided Feb. 28, 1977.

James E. O'Brien, Peter G. Loftus, Scranton, for appellant.

Paul R. Mazzoni, Dist. Atty., William J. Garvey, Ernest J. Gazda, Jr., Scranton, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION

JONES, Chief Justice.

Appellant, Adam Andrew Topa, was tried before a jury and convicted of murder in the first degree. From his conviction he filed a motion for new trial delineating fifteen reasons in support thereof. The court en banc denied appellant's motion. On this appeal, appellant urges us to reexamine six issues which he believes warrant reversal and command a new trial. Five of these arguments relate to the use made by the Commonwealth of a tape recording of a telephone call received by the police from an individual who identified himself as "Roger Ferretti" and claimed to have committed the murder for which appellant was convicted.[1] Because we find that

1. The five arguments are: (1) that the trial court erred by allowing a recording of a telephone call made to the Scranton police and recorded without the caller's knowledge or consent to be introduced into evidence at appellant's trial; (2) that the trial court erred by requiring appellant to make a second recording for the purpose of comparing his voice with the voice of the person who called the Scranton police; (3) that the trial court erred by allowing expert testimony based upon voice print comparison tests;

the trial court erred in allowing expert testimony concerning spectrograph, or voiceprint, analysis of the recorded telephone call, we reverse the judgment of sentence and remand for a new trial.

This case begins on Sunday, October 22, 1972, at about 12:40 p. m. with the discovery, by two boys hiking through a remote area near St. Patrick's Cemetery in Blakely, Pennsylvania, of the body of a woman. One of the boys ran to his grandmother's house to alert his father who was a medical doctor. Upon their return, the doctor made a cursory examination of the body and determined that the person had expired. Shortly thereafter, several police officers arrived as did the coroner of Lackawanna County. The coroner identified the decedent as Mary Ellen Walsh.

The following is a summary of the evidence of the crime introduced at trial. It is presented in the light most favorable to the Commonwealth as verdict winner. *See Commonwealth v. Robson,* 461 Pa. 615, 625, 337 A.2d 573, 578 (1975); *Commonwealth v. Boyd,* 461 Pa. 17,

(4) that the trial court improperly limited cross-examination of a Commonwealth witness concerning a recording of appellant's voice made without his knowledge or consent while he was being interrogated by state police; and (5) that the trial court erred by denying appellant's motion for a mistrial when it appeared that the Commonwealth had twice deceived both the trial court and defense counsel concerning the existence of the interrogation recording.

The third argument is meritorious. Because we reverse on the basis of that allegation we need not address the remainder. However, the factual allegation that the Commonwealth deceived both the defense and the trial court is verified by the trial court's opinion dismissing on the merits, post-trial motions which raised all of the issues concerning the recordings urged here. Appellant argues that he was prejudiced by the Commonwealth's refusal, despite the trial court's mandate, either to reveal the existence of the interrogation tape or to turn over to it the first, inconclusive voiceprint comparison test. This claim has substantial appeal, for the interrogation recording which was withheld by the Commonwealth might have made a powerful exhibit for the cross-examination of the voiceprint expert. We need not reach this issue, however, for the reason stated above.

334 A.2d 610 (1975); *Commonwealth v. Murray*, 460 Pa. 605, 334 A.2d 255 (1975):

(1) Four witnesses saw appellant with the victim on the evening before her body was found. Two of the witnesses described the victim's clothing and identified her coat in court. One of the witnesses identified appellant's jacket in court.

(2) The victim's body was discovered in an area which was accessible only by means of a rutty, lightly traveled road composed of mud, stone, rock and shale.

(3) On the day the victim's body was discovered, appellant was observed, by several policemen, driving past the crime scene. When he saw the officers he rapidly left the area.

(4) About a quarter of an hour later the Scranton police received a telephone call from "Roger Ferretti". This call was taped in the normal course of police operations. This caller claimed to be telephoning from a local VFW post, and also stated that he had just stabbed a woman in the cemetery. An expert testified that, on the basis of voiceprint comparison tests he had performed, appellant was the caller.

(5) Mr. Roger Ferretti testified that he did not make the call to the Scranton police, and further testified that at about 1:30 p. m. on the day the call was made, appellant was in the VFW post staring at him strangely. Ferretti stated that when he asked appellant why he was staring at him, appellant replied that he was mad at Ferretti.

(6) Approximately one hour after the call was made, appellant was seen by the state police in the VFW post with what was suspected to be a bloodstain on his jacket sleeve. He was taken into custody and interrogated.

(7) Blood on appellant's jacket sleeve was inconsistent with his own blood, but was consistent with the victim's blood.

(8) Wool fibers taken from the bloodstain on the jacket were identical with fibers taken from the victim's coat. An expert testified that the fibers were located in the stain in such a way that they could only have been deposited in the stain when the blood was still wet.

(9) Appellant was missing a button from his jacket. A button found near the body was identical to the remaining buttons on appellant's jacket.

(10) The victim's body revealed thirty-five stab wounds on the right side of her trunk, one of which punctured a main vein of the body. These wounds were the immediate cause of death.

As set forth above, on October 22, 1972, a person called the Scranton Police Department, identified himself as "Roger Ferretti" and made a report saying he had stabbed a woman and indicating where her body could be found. This call was taped by the Scranton police. Roger Ferretti was located and denied making the phone call. After appellant's arrest, the Commonwealth petitioned the lower court to require the appellant to make a recording via the telephone wherein he would repeat some of the same words as in the October 22 call to the police. The purpose of this request was to enable the Commonwealth to submit both tapes to a voiceprint expert in order to determine whether the appellant was the original caller.

The court below granted the Commonwealth's petition and another tape recording of appellant's voice was produced. This recording, along with the recorded October 22 telephone call and a tape recording of the known voice of Roger Ferretti, was then subjected to voiceprint analysis by the Commonwealth's expert in the field of spectrography, Lieutenant Ernest W. Nash of the Michigan State Police. From a comparison of spectrograms made from the tapes, Lieutenant Nash concluded that the telephone call into police headquarters was definitely not

made by Roger Ferretti, but was definitely made by the appellant.

On the witness stand, Lieutenant Nash testified that he was employed by the Michigan State Police as the officer in charge of the Voiceprint Identification Unit of the Scientific Crime Laboratory stationed at East Lansing, Michigan. He was selected in 1966 to be trained as an analyzer of spectrograms because of his background in electronics and his training in fingerprint analysis. He studied spectrography in 1967 under Mr. Lawrence Kersta, the acknowledged innovator in the field, and since the fall of 1968, has studied audiology and speech sciences at Michigan State University. His academic advisor and teacher there has been Dr. Oscar Tosi who has conducted extensive experiments with the sound spectrograph and testified as an expert on voiceprint analysis in many cases. At the time of the trial, Lieutenant Nash had been analyzing spectrograms for upwards of six years, had examined more than three thousand voices and had analyzed in excess of 180,000 voiceprints.

Spectrograms, or voiceprints, are the product of the sound spectrograph machine which was described by Lieutenant Nash in his testimony:

"The sound spectrograph, for one part of it, it is a regular tape recorder. It has the ability to record and play magnetic tape recordings. There also is a bank of filters and a variable filter with a pickup head that analyzes a 2.4 second segment of the tape at one time, and during the analysis cycle, the magnetic information on the tape is picked up by the scanning head and it is transformed into electrical energy which is passed through the bank of filters and brought out to a stylus, or a piece of wire, that is writing on the spectrogram paper during the analyze cycle, and as the paper revolves in front of that piece of wire, wherever energy is present, there is an electrical fire or spark that comes off the wire that burns the pattern onto the pa-

per making a permanent record." Notes of Testimony, p. 405.

Spectrograms are compared, in much the same way as are fingerprints, for points of similarity which identify the speaker. The theory behind voiceprint identification was also explained by Lieutenant Nash:

"As each one of the ridges on your fingers or on the palm of your hand differ from each other, so do all of the other parts of your body. They are unique to you and . . . include your voice mechanisms. So the theory is that if you use unique voice mechanisms to produce the sounds of your voice, then the sounds will also be unique. Then by taking a recording of your voice and subjecting it on one occasion to analysis by the sound spectrograph, and then doing the same thing on another occasion with your voice, subjecting it to the same process, that those uniquenesses will be displayed on the pieces of paper or the voice prints." *Id.*, pp. 427–428.

Although Lieutenant Nash is convinced of the validity of the theory and the reliability of the spectrographic process, his certainty is not shared by all commentators and scientists in the field who have emphasized, for example, the dissimilarities between fingerprints and spectrograms. A concise statement of those distinguishing factors is contained in Note, *Voiceprint Identification*, 61 Geo.L.J. 703, 725 (1973):

"An individual's fingerprint ridges do not vary. Speech, however, has not been proven to be invariant. Fingerprints cannot be disguised; speech can. Further, fingerprints do not change with age or illness. Whether voices change under these circumstances is uncertain. A further significant difference is that fingerprints are primary evidence. Voiceprints, on the other hand, are graphic representations of a speaker's voice. Thus, unlike fingerprints, a voiceprint can be produced only through the intervention of a me-

chanical device, the sound spectrograph. Consequently, the spectrographic pattern, unlike the fingerprint, can be affected by such extraneous factors as distortions of frequency, energy, or the time involved in the transmission of sound."

*See also* Jones, *Evidence vel non, The Non Sense of Voiceprint Identification*, 62 Ky.L.J. 301, 318 (1974).[2] They have also noted the similarities which are present in both spectrograph and polygraph testing.[3] In both instances the probative value of the expert opinion testimony offered hinges on the competence of the person who administers the test and interprets the results, as well as on the reliability of the mechanical device employed. Lieutenant Nash agrees that the interpretation of spectrographic test results is subjective. Moreover, the process demands the services of individuals with highly developed skills in the areas of audiology and speech sciences and electronics. Thus, as with the lie detector, there is the danger that the trial judge or jury will ascribe a degree of certainty to the testimony of the expert spectrography witness which may not be deserved. *See* Jones, *supra*, 62 Ky.L.J. 301, 305; Note, *supra*, 61 Geo. L.J. 703, 726; Note, 12 N.Y.L.F. 501, 507 (1966).

██ ██ In his testimony, Lieutenant Nash discounted the problems which have been raised in the law review articles noted above. He asserted that mimicry of voices

2.  Dr. Tosi, himself, has observed, while testifying, that voiceprint identification is more difficult than fingerprint identification because of the inability, at this time, to classify voices:
    "We do not classify voices. In my dream, it is my dream to have a file of voices and when you have a voice of the offender you go to the file and select ten or fifteen that have the same classification and then try to see if they are known within this or not. The same as fingerprints. In the context, yes, I think more studies have to be done." *Worley v. State*, 263 So. 2d 613, 618 (Fla.App.1972) (dissenting opinion).

3.  The results of a polygraph examination are generally inadmissible in Pennsylvania. *Commonwealth v. Gee*, 467 Pa. 123, 354 A. 2d 875 (1976); *Commonwealth v. Brooks*, 454 Pa. 75, 309 A.2d 732 (1973).

will not affect the accuracy of voiceprint identification, that the voice analysis is made more reliable by the aural examination of the tape recordings in conjunction with spectrogram interpretation, and that there is no possibility of two different people producing the same spectrogram. We do not question the sincerity of Lieutenant Nash's testimony and we respect his considerable expertise in the area of spectrography. But his opinion, alone, will not suffice to permit the introduction of such scientific evidence into a court of law. Admissibility of the evidence depends upon the *general* acceptance of its validity by those scientists active in the field to which the evidence belongs

"Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, *the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." Frye v. United States,* 54 App.D.C. 46, 293 F. 1013, 1014 (1923) (emphasis supplied).

*See also Commonwealth ex rel. Riccio v. Dilworth,* 179 Pa.Super. 64, 115 A.2d 865 (1955). We agree with those courts which have strictly applied the *Frye* standard in considering the introduction of voiceprint evidence that it is not, as yet, admissible, *United States v. McDaniel,* 538 F.2d 408 (D.C.Cir. 1976); *United States v. Addison,* 498 F.2d 741 (D.C.Cir. 1974); *People v. Kelly,* 17 Cal.3d 24, 130 Cal.Rptr. 144, 549 P.2d 1240 (1976); *People v. Law,* 40 Cal.App.3d 69, 114 Cal.Rptr. 708 (1974); *People v. King,* 266 Cal.App.2d 437, 72 Cal.Rptr. 478 (1968); *State v. Cary,* 99 N.J.Super. 323, 239 A.2d 680 (1968), *aff'd* 56 N.J. 16, 264 A.2d 209 (1970); *contra, Common-*

wealth v. Lykus, 327 N.E.2d 671 (Mass.1975); [4] State v. Olderman, 44 Ohio App.2d 130, 336 N.E.2d 442 (1975).

Strict application of the *Frye* standard when scientific proof is offered is essential if the defendant is to receive a just and fair trial:

> "The requirement of general acceptance in the scientific community assures that those most qualified to assess the general validity of a scientific method will have the determinative voice. Additionally, the *Frye* test protects prosecution and defense alike by assuring that a minimal reserve of experts exists who can critically examine the validity of a scientific determination in a particular case. Since scientific proof may in some instances assume a posture of mystic infallibility in the eyes of a jury of laymen, the ability to produce rebuttal experts, equally conversant with the mechanics and methods of a particular technique, may prove to be essential." *United States v. Addison*, 498 F.2d at 744.

*See also People v. Law, supra,* 40 Cal.App.3d at 75, 114 Cal.Rptr. at 712; *People v. King, supra,* 266 Cal.App.2d at 461, 72 Cal.Rptr. at 493; *Jones, supra,* 62 Ky.L.J. at 306. The testimony of one expert, Lieutenant Nash, cannot satisfy this standard. Furthermore, we must conclude, from our study of those cases and commentaries which have addressed the issue, that the reliability of the sound spectrograph and voiceprint identification has not, as yet, been generally accepted by the scientific community concerned with acoustical science. In 1970, for example, a panel of speech scientists reported that the majority of professionals in their field were "deeply concerned about the use of spectrographic evidence in the courts":

> "[T]he available results are inadequate to establish the reliability of voice identification by spectrograms."

4. *But see, Commonwealth v. Lykus*, 327 N.E.2d 671, 679 (Mass. 1975) (Kaplan, J., separate opinion).

Bolt, Cooper, David, Denes, Pickett & Stevens, *Speaker Identification by Speech Spectrograms: A Scientist's View of its Reliability for Legal Purposes*, 47 J. Acoust.Soc.Am. 597, 603 (1970).

In the wake of further voiceprint experimentation, the same panel of experts declined to alter their position:

"Our interpretations of the new data lead us to reiterate our previous conclusion: that the degree of reliability of identification under practical conditions has not been scientifically established." *Bolt et al., Speaker Identification by Speech Spectrograms: Some Further Observations*, 54 J.Acoust.Soc.Am. 531 (1973).

These reports are supported by the testimony of scientists who testified as experts in other cases involving voiceprint identification. *United States v. Addison, supra*, at 745; *People v. Law, supra*, 40 Cal.App.3d at 80–81, 114 Cal.Rptr. at 715–716; *State v. Andretta*, 61 N.J. 544, 548–549, 296 A.2d 644, 646–647 (1972); *see also* Note, *supra*, 61 Geo.L.J. 703 (1973). Thus, it was error to permit the introduction of voiceprint evidence at appellant's trial.

█ Trial error is not harmless "unless it is clear beyond a reasonable doubt that it did not affect the result." *Commonwealth v. Jones*, 233 Pa.Super. 52, 59, 335 A.2d 444, 447 (1975). Because the prosecution's case against appellant was built on circumstantial evidence, we cannot conclude beyond a reasonable doubt that the admission of scientific evidence, the effect of which was to present before the jury a confession to the crime, did not affect the result. The error was prejudicial and necessitates a new trial.

Judgment of sentence reversed. Case remanded for a new trial.

ROBERTS, J., filed a concurring opinion.

ROBERTS, Justice, concurring.

I concur in the result based on a narrower ground than that addressed by the majority. I believe that the

Commonwealth's failure to reveal the existence of exculpatory evidence to the defense violated due process and requires a new trial. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); U.S.Const. amend. V, XIV; Pa.Const. art. I, § 9.

On October 22, 1972, a man identifying himself as Roger Ferretti called the Scranton Police Department. He said he had stabbed a woman and indicated where her body could be found. This telephone call was taped by the Scranton police. Roger Ferretti was located and denied making the call. After appellant's arrest, the Commonwealth petitioned the trial court to require appellant to make a recording over the telephone, repeating some of the words of the October 22 call to the police. The purpose of this request was to enable the Commonwealth to submit both tapes to a voiceprint expert in order to determine whether the appellant was the original caller.

At the time of the prosecutor's request for a voice exemplar, the court and appellant's counsel were informed that the Commonwealth had no recordings, other than the original call to the Scranton police, which could be used for the comparison.

On the basis of this information the trial court entered the following order in pertinent part:

". . . it being further the Order of this Court that a copy of the recording and any voice prints thereof and a copy of the report given to the District Attorney of Lackawanna County, together with the list and a setting forth of the type of equipment and the method used in analyzing and identifying the recording and the voice print will be submitted by the District Attorney of this County to the defense counsel within forty-eight hours after such reports have been received by the District Attorney."

The Commonwealth gave appellant a copy of the recording taken pursuant to this order.

At trial, testimony revealed that the Commonwealth's earlier representations to the court and the defense were false. In fact, the police had recorded appellant's voice without his knowledge on the night decedent's body was found. The Commonwealth's voiceprint expert testified that his comparison of the "secret tape" with the tape of the incriminating phone call was inconclusive.

Upon learning of the existence of the "secret tape," appellant moved for a mistrial. After a hearing, his motion was denied. Concealment of the "secret tape" deprived appellant of a fair trial.

In *Brady v. Maryland*, 373 U.S. at 87, 83 S.Ct. at 1196–1197, the United States Supreme Court held that

". . . the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

Accord, *Commonwealth v. Powell*, 449 Pa. 126, 295 A.2d 295 (1972) ; *Lewis v. Court of Common Pleas*, 436 Pa. 296, 260 A.2d 184 (1969). In *Moore v. Illinois*, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972), the Court set the following guidelines for a meritorious *Brady* claim: "(a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence." 408 U.S. at 794–95, 92 S.Ct. at 2568.

Here, the prosecution not only suppressed evidence favorable to the defense, but also made a misrepresentation to the trial court in order to obtain an order compelling a voice exemplar. The prosecution already possessed an exemplar which did not support its case. Clearly, the first two requirements of *Brady* have been met. The Commonwealth asserts, however, that the evidence was not material. I cannot agree.

Recently, in *United States v. Agurs*, 427 U.S. 97, 96 S. Ct. 2392, 49 L.Ed.2d 342 (1976), the Court defined three

situations in which a prosecutor's failure to disclose evidence to the defense may violate due process and established a different standard of materiality for each situation. First, when a prosecutor knowingly employs or condones perjured testimony, the conviction must be set aside "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." Id. at 103, 96 S.Ct. at 2397 (footnote omitted). When the defense requests specific items, the failure of the prosecution to produce exculpatory evidence requires a reversal if the evidence "might have affected the outcome of the trial." Id. at 106, 96 S.Ct. at 2398. Finally, when the defense has made only a general request for exculpatory material or makes no request at all, the prosecutor's failure to voluntarily disclose exculpatory evidence requires reversal if the evidence creates a reasonable doubt as to the defendant's guilt. Id. at 110–114, 96 S.Ct. at 2401–02.

Here, the prosecution was fully aware of the court order to provide all exemplars to the defense.[1] As Mr. Justice Stevens stated for the majority in *Agurs*: "[W]hen the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable." Id. at 106, 96 S.Ct. at 2399. Under *Agurs*, if the suppressed evidence might have affected the outcome of the trial, due process requires that appellant's conviction be reversed.[2]

1. The Commonwealth contends that the trial court's order did not apply to the first tape. This argument is completely without merit. As the trial court's opinion stated:
   "We reject the Commonwealth's argument that this Order applied only to the Court Ordered recording of the Defendant's voice, and agree with defense counsel that it was the intention of that Order that the Commonwealth would make all matters available to the defense."

2. This Court is free to accord greater rights under state law than mandated by the federal constitution. See *Oregon v. Hass,* 420 U.S. 714, 719, 95 S.Ct. 1215, 1219, 43 L.Ed.2d 570 (1975); *Cooper v. California,* 386 U.S. 58, 62, 87 S.Ct. 788, 791, 17 L.Ed.2d 730 (1967); *Commonwealth v. Triplett,* 462 Pa. 244, 341 A.2d 62

As the majority notes, the prosecution's case was built on circumstantial evidence. In particular, proof of the identity of the perpetrator of the crime was dependent upon the voiceprint identification. Evidence which would impeach or lessen the weight of the prosecution's identification evidence may well have affected the outcome of the trial. See *Commonwealth v. Hunt*, 224 Pa. Super. 177, 178, 302 A.2d 840, 841 (1973) (Opinion in Support of Reversal). Moreover, if defense counsel had the opportunity to develop and follow upon the suppressed evidence, its exculpatory impact could have been enhanced. See *United States v. Agurs*, 427 U.S. at 119 & n.6, 96 S.Ct. at 2405 & n.6 (Marshall, J., dissenting, joined by Brennan, J.). See generally *Giles v. Maryland*, 386 U.S. 66, 96, 87 S.Ct. 793, 808, 17 L.Ed.2d 737 (1967) (Fortas, J., concurring).

I concur with the majority's decision to order a new trial.

(1975). See generally Brennan, State Constitutions and the Protection of Individual Rights, 90 Harv.L.Rev. 489 (1977). Since this case involves a focused request for evidence it is unnecessary to consider whether this Court should adopt a standard of materiality which provides greater assurance that the suppression of evidence did not harm the accused. See generally *United States v. Agurs*, 427 U.S. 97, 114–122, 96 S.Ct. 2392, 2402–06, 49 L.Ed.2d 342 (Marshall, J., dissenting, joined by Brennan, J.); Note, The Prosecutor's Constitutional Duty to Disclose Exculpatory Evidence in the Absence of a Focused Request from the Defense, 14 Am.Crim.L.Rev. 319 (1976).