**Com. v. LaPaglia**

*Donald A. Mancini,* for Commonwealth.
*John LaPaglia,* pro se.

GAWTHROP, III, *J.,* June 12, 1981 — We have heard, de novo,[1] a summary appeal for violation of (maximum speed limits) of the Vehicle Code, 75 Pa.C.S.A. §3362(a)(2), exceeding 55 miles per hour, which we are now called upon to decide.

The Commonwealth called two witnesses, Corporal Fred A. Scott and Trooper Raymond Davis, both of the Pennsylvania State Police, and defendant, proceeding pro se,[2] testified in defense. The somewhat novel wrinkle presented by the case was the location of the officer who was clocking the car; he was in a helicopter, approximately 2,000 feet above the earth, sending his grounded confederate radio instructions as to which car or cars to pursue and pull over. The issue in the case comes down to whether the car ultimately ticketed by Corporal Scott was the one which Trooper Davis identified by radio as the one he observed speeding through the .3 of a mile measured[3] and marked upon the Pennsylvania Turnpike, in Chester County, in the vicinity of Valley Forge.

---

1. See: Pa.R.Crim.P. 63(f), 67(f).

2. Cf: Faretta v. California, 422 U.S. 806 (1975).

3. The distance had been recently and personally double-checked by the trooper, who accomplished his mensuration by means of a 100-foot metal tape.

The Commonwealth contended testimonially that Trooper Davis observed a silver and gray car obviously speeding,[4] appreciably exceeding the general rate of the traffic flow. The airborne Trooper Davis, on direct, stated that he then guided out his colleague below to find the culprit car and pull it over, and this was done without mishap. This testimony was corroborated by his earthbound associate, Corporal Scott. The weather was fair and dry; there was no evidence of any visual aids, such as binoculars, having been used from the air.

Defendant, on the other hand, asserted from the stand that the troopers must have made an honest mistake in singling out his car. He stated that there were, in fact, several cars pulled over and that another car, a white one, had been the actual offender. He testified without objection that the driver of that car, upon being beckoned to leave by Corporal Scott, gave a look of puzzled surprise. Defendant further stated that his car on that occasion was brand new, with approximately 400 miles on it, and that it was only partially silver but had a hood and roof that were unequivocally black, so that the aerial apparition had to be principally black. Further, he said that he had just observed a cluster of troopers by the Turnpike shortly before this confrontation, and that their presence had further diminished his already lawful velocity, his speed also having been curtailed by the newness of the car and defendant's desire to break it in gingerly.

In rebuttal, the troopers resumed the stand, con-

---

4. Contrary to the language of the citation, which says "Radar," Trooper Davis determined the speed with a stopwatch and a table computed according to the basic formula, rate of speed $= \dfrac{\text{distance}}{\text{time}}$

ceded for the first time that there had been more than one car pulled over, but reasserted their confidence in the accuracy of their joint selection of the one to be cited. Trooper Davis pointed out that his report of the incident, made once the car was pulled over, read "gray and black" for the car's description.

## DISCUSSION

Preliminarily, we are mindful of the importance of the speeding restrictions set forth in our Vehicle Code. The courts are clogged with cases demonstrating the grave consequences of violation thereof. The carnage on the highways must be curtailed and enforcement of these laws is an important step to that end. Accordingly, even though this case be but a summary one, it is by no means de minimis. We treat it accordingly.

Conversely, we are mindful that, perhaps in recognition of the gravity of this proceeding, the procedural protections afforded one in a criminal prosecution pertain in this summary case as well. See, Borough of West Chester v. Lal, 493 Pa. 387, 391, 426 A. 2d 603, 605 (1981). At the cornerstone of such rights and protections is the fundamental right to require the Commonwealth to prove one's guilt beyond a reasonable doubt. [5] We apply these considerations to the facts at bar.

There is no real contention here as to there having been a speeding violation committed. The evi-

---

5. A "reasonable doubt" has been defined as "the kind of doubt that would restrain a reasonable man or woman from acting in a matter of great importance to himself or herself." Com. v. Banks, 454 Pa. 401, 311 A. 2d 576, 581 (1973). See also: Com v. Drum, 58 Pa. 9, 22 (1868) ". . . induce a man of reasonable firmness and judgment . . . to act . . . in a matter of importance to himself . . ."

dence was clear, convincing, and indeed, unrebutted that someone was speeding. The issue here, rather, is one of identification: was this defendant the driver of the overly quick car? Or, more precisely, has the Commonwealth proved that contention beyond a reasonable doubt? We conclude that it has not, and hence, we acquit and dismiss the prosecution.

The issue in the case hence devolves to one solely of identification, and we turn to the Supreme Court of the United States for guidance. They have oft spoken on that issue. In U.S. v. Wade, 388 U.S. 218, 228 (1967), it was observed:

But the confrontation compelled by the State between the accused and . . . witnesses to a crime to elicit identification evidence is peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial. The vagaries of eyewitness identification are well known; the annals of criminal law are rife with instances of mistaken identification. Mr. Justice Frankfurter once said: "What is the worth of identification testimony even when uncontradicted? The identification of strangers is proverbially untrustworthy. The hazards of such testimony are established by a formidable number of instances in the records of English and American trials."

Our research has not disclosed any cases in which these principals have been considered in the context of an identification from helicopter, and hence, we believe this to be a case of factual first impression. We conclude, however, that the thinking of the traditional identification cases logically applies in this context. We recognize that cars coming from an assembly line, although not fungible,

are in many respects quite similar in appearance,[6] size, color, et cetera. The task of observer hovering high in the air, to single out one car from a group traveling down a crowded highway, and then accurately to communicate his observations, the results of his surveillance, from the air to his earthbound ally, presents an identification and communication scenario fraught with potential for innocent miscarriage of justice. Much faith is necessarily placed upon the surveillant's visual acuity and verbal agility. In the twinkling of an eye, he must precisely perceive and then accurately translate that visual perception into clear and unambiguous words. The description must be both sufficiently complete to identify the perpetrator as well as to exclude the innocent. Such description would necessarily require a mouthful. Any breakdown in this chain of vision, speech, hearing, and comprehension will tend inevitably to engender injustice. As for the potential for a message being misspoken or misheard, history is replete with ambiguous or misunderstood communiques which resulted in disaster.[7] We recall that the first criterion

---

6. We observe that marked State Police cars are now serially numbered, with large digits displayed upon the trunk, presumably for unambiguous aerial identification.

7. The military fiascos at Balaclava (the infamous Charge of the Light Brigade under Thomas Brudenell, the seventh and last of Earl of Cardigan), and Arnhem (Gen. Montgomery's ill-fated Operation Market-Garden) provide two celebrated examples. The charge of the Light Brigade, immortalized by Tennyson, was an appalling blunder. The misinterpretation of Lord Raglan's written order by Lord Lucan was inexcusable (Cardigan and the 672 others of the Light Brigade would concur). Nevertheless, in light of mankind's fallibility, Lucan's error is understandable.

A fortiori, there is propensity for error when the message is not written upon paper, but oral, and with wonders of modern

for detemining reliability of an identification is the manner in which it was conducted: Com v. Slaughter, 482 Pa. 538, 546, 394 A. 2d 453. 457 (1978). Of course, "Where the opportunity for positive identification is good . . . the testimony as to identification need not be received with caution. . . . On the other hand, where the witness is not in a position to clearly observe the assailant . . . the accuracy of the identification must be received with caution." Com v. Kloiber, 378 Pa. 412, 424, 106 A. 2d 820 (1954), cert. denied, 348 U.S. 875 (1954). Accordingly, because of the misgivings we have already expressed as to the inherent difficulties with the method of identification here used, we hold that it is so fraught with risk of innocent error that it must be scrutinized with care and received with caution before being accepted as true by the fact-finder. "A conviction which rests on mistaken identification is a gross miscarriage of justice." Gilbert v. California, 388 U.S. 263, 272 (1967).

Applying that principle to the present facts, and

---

technology, transmitted through the ether. The decimation of Maj. Gen. Urquhart's 1st British Airborne Division at Arnhem highlights the potential for problems when using radio equipment in airborne operations, communication devices may not always be relied upon with complete confidence. The ever-present possibility of human error, compounded by equipment malfunction, makes communication lapses between organized parties operating in the field highly possible, if not probable. Despite the best of intentions, and despite gallantry in the face of unparalleled odds, the battles at both Balaclava and Arnhem demonstrate the potential for disaster when communication fails. See: Cecil Woodham-Smith, The Reason Why, (New York: E.P. Dutton & Co., Inc., 1953); Donald Thomas, Cardigan, (New York: The Viking Press, 1974); Cornelius Ryan, Bridge Too Far, (New York: Simon and Schuster, 1974); B.H. Liddell Hart, A History of the Second World War, (New York: E.P. Putnam's Son, 1972.)

considering the heavy traffic present on the road that day, the testimony of defendant as to the other turnpike driver whom he saw and who expressed surprise at his liberation, we find that we have reasonable doubt. Hence our verdict.

In so holding, we expressly do not reach our conclusion from any visceral distaste that one might have for some Orwellian deus-ex-machina peering down upon the citizenry from above. Indeed, the history of law enforcement is rich with scientific and technological advances which have done much in the search for truth — not only to ensnare the guilty[8] but also to exculpate the innocent.[9] On the other hand, we should be wary to avoid technological advances that, under the appearance of scientific wizardry, instead inject potential for injustice.[10] We believe the procedure here used to fall with the penumbra, at least, of that latter category.

---

8. See: Com v. Roller, 100 Pa. Superior Ct. 125 (1930); ("talking motion picture evidence admissible"); Com v. Cichy, 227 Pa. Superior Ct. 480, 323 A. 2d 817, 819 (1974) (fingerprint evidence admissible); 42 Pa.C.S.A. §6111 (expert handwriting evidence admissible); 75 Pa.C.S.A. §3368(c)(2) (radar evidence as to speed admissible); Com v. DiFrancesco, 458 Pa. 188, 329 A. 2d 204 (1974) (breath and blood tests to determine intoxication admissible).

9. See: 42 Pa.C.S.A §6136; Little v. Streater, 452 U.S. 1, 49 U.S.L.W. 4581 (1981) (blood tests to exclude paternity admissible).

10. See: Com v. Topa, 471 Pa. 223, 233, 369 A. 2d 1277, 1278 (1977); (spectograph, or voice-print analysis, inadmissible); Com v. Gee, 467 Pa. 123, 354 A. 2d 875 (1976) (polygraph evidence inadmissible).