456 A.2d 561

**COMMONWEALTH of Pennsylvania**

v.

**Bennie Davis GRAVES, Appellant.**

Superior Court of Pennsylvania.

Argued May 20, 1982.

Filed Feb. 4, 1983.

186

John H. Corbett, Jr., Public Defender, Pittsburgh, for appellant.

Dara A. DeCourey, Assistant District Attorney, Pittsburgh, for Commonwealth, appellee.

Before ROWLEY, MONTEMURO and VAN der VOORT, JJ.

VAN der VOORT, Judge:

A jury found appellant guilty of third degree murder for the death of Lynette Weston, age 10, and of first degree murder for the death of Lloyd Weston, age 10, and recommended a death sentence on the first degree murder conviction. Trial Judge Joseph Ridge refused post-trial motions for a new trial and in arrest of judgment, but did grant a motion to vacate the death sentence.

Appellant raises four contentions before this court. Issues designated I and IV are interrelated and will be discussed jointly.

## I and IV

Appellant was the stepbrother and boarder of Yvonne Weston, the mother of the two children. At about 11:00 P.M. on February 16, 1979, Mrs. Weston left her home, entrusting the care of the two children to the appellant. The children were asleep. From about 11:30 P.M. to about 4:45 A.M. the next morning, Mrs. Weston's brother Daniel Anderson was in the home drinking beer and listening to records. When he departed, the living room was in reason-

ably good order; appellant was present; and the children apparently sleeping in their beds. At about 7:00 A.M. on February 17, 1979, when Mrs. Weston returned home she found the living and dining rooms in complete disarray; the bodies of the two children were lying on the living room floor, and the appellant was missing.

Shortly thereafter appellant telephoned Mrs. Weston several times from some undisclosed phone,[1] asking if the children were all right. He claimed he had been visited in the home by three men looking for another of Mrs. Weston's brothers who forced him to leave the home. On a fourth phone call, appellant was advised that the children were dead; he revealed his whereabouts. A police car picked him up at that location and took him to Police Station No. 5. He was locked up for about twenty minutes and then taken to Police Station No. 1, where he was interrogated through most of the day, finally being placed formally under arrest at 5:30 P.M.

Prior to the formal arrest, he surrendered hair and saliva samples and fingernail clippings, and agreed to the making of wax impressions of his fingernails. The police also took photographs of several fresh scratches on his back. These bits of "physical evidence" were used as part of the circumstantial evidence by which the prosecution attempted to identify the appellant as the perpetrator of the murders. The appellant moved to suppress their use on the ground that they were the product of an illegal arrest and obtained without a search warrant and without his valid consent.

Whether such evidence, obtained following an illegal arrest, resulted from such arrest or was sufficiently removed from the arrest depends on the circumstances of the case. *Commonwealth v. Nelson*, 488 Pa. 148, 411 A.2d 740 (1980) (Opinion in support of affirmance); *Commonwealth v. Bogan*, 482 Pa. 151, 393 A.2d 424 (1978).

The prosecution called ten witnesses on the motion to suppress, including Mrs. Weston who went to Station No. 1

---

1. Appellant also telephoned Daniel Anderson, telling him to "go over to the house with Cookie (Mrs. Weston)" (N.T., p. 556).

and talked with appellant in the room in which he was confined. Appellant testified that he had been beaten by several of the investigating officers, and consented to the taking of the samples so that the beatings and the interrogation would stop.

Judge Ridge heard all the witnesses; and he concluded that, despite the illegal arrest, the samples were taken with the voluntary and valid consent of the appellant. His opinion cites *Commonwealth v. Tribblett*, 242 Pa. Superior Ct. 164, 363 A.2d 1212 (1976) and *Commonwealth v. Burgos*, 223 Pa. Superior Ct. 325, 299 A.2d 34 (1972). See also *Commonwealth v. Pytak*, 278 Pa. Superior Ct. 476, 487, 420 A.2d 640 (1980) and *Commonwealth v. Woods*, 240 Pa. Superior Ct. 72, 76, 368 A.2d 304 (1976). As pointed out in *Tribblett*, 242 Pa. Superior Ct. at 167, 363 A.2d 1212, deference should be given to the decision of the hearing court, since that court had a firsthand opportunity to observe the appearance and demeanor of the witnesses, and therefore, to evaluate the credibility of the witnesses.

■ We find that the trial judge did not err. The current case is more in line with *Bogan, supra*, than with *Nelson*, supra. In *Bogan*, the court assuming the arrest was illegal, found a confession resulted from an "intervening act of a free will." *Wong Sun v. United States*, 371 U.S. 471, 491, 83 S.Ct. 407, 419, 9 L.Ed.2d 441 (1963). Bogan had been in custody on other charges when he gave a confession to the crime from which he appealed his conviction. Whereas in *Nelson*, the defendant was unknown to the police until he was illegally arrested. The court found that but for the improper arrest, a statement and physical evidence would not have been forthcoming. Here appellant was a logical candidate for questioning; he was the last known person present with the victims and he explained his absence with an unusual tale. Under these circumstances we cannot overrule the lower court's finding that the arrest did not contaminate appellant's voluntary consent to the taking of the various samples.

■ We also must agree with the Commonwealth that the physical evidence and appellant's consent to the taking of the samples were not vitiated by the fact that he was not arraigned within six hours after his initial arrest. The appellant argues to the contrary, contending that under *Commonwealth v. Futch*, 447 Pa. 389, 290 A.2d 417 (1972) and *Commonwealth v. Williams*, 455 Pa. 569, 319 A.2d 419 (1974), and distinguishing *Commonwealth v. Davenport*, 471 Pa. 278, 370 A.2d 301 (1977), that any evidence obtained during a delay between arrest and arraignment, must be suppressed if (1) the delay was unnecessary; (2) the evidence was prejudicial; and (3) the evidence was reasonably related to the delay.

In *Commonwealth v. Rhem*, 283 Pa. Superior Ct. 565, 578, 424 A.2d 1345, 1351–52 (1981), this court held:

By its very terms, the six-hour rule is only applicable to inculpatory statements (Fn. 4) and not physical evidence. The inherent coercion during an unnecessary delay which may result in an *invalid waiver of important constitutional rights* is simply not present in Fourth Amendment cases where the search proceeds despite the accused's objections. Thus, the coercive influence against which "Futch" and "Davenport" were designed to guard is absent in the instant case since appellant was not asked to waive any rights. The court properly denied the motion to suppress.

(Emphasis supplied).

4. The rule probably applies to uncounseled lineup identifications as well. See "Futch", supra.

(Footnote in original).

Appellant contends that the giving of his consent was a product of a delay exceeding six hours and should be viewed as an invalid waiver of an important constitutional right. *Davenport*, supra, clearly addressed itself only to *statements* given by a defendant. *Rhem*, supra, involved the search of a suspect when brought to the police station, he was not free to refuse the search. Here, appellant argues that he was free to refuse the taking of samples but

due to the pressures of the situation he consented. He concludes that the *Davenport* rule must be extended to such situation.

■ The courts of this Commonwealth have held that fingerprints are not of a testimonial nature involving the Fifth or Sixth Amendment, *Commonwealth v. Ellis*, 445 Pa. 307, 284 A.2d 735 (1971); and that blood samples are not testimonial evidence coming under the protection of the Fifth Amendment and therefore do not require *Miranda* protection. *Commonwealth v. Funk*, 254 Pa. Superior Ct. 233, 385 A.2d 995 (1978). The purpose of an early arraignment is to advise the appellant, among other rights, of his right to counsel. Rule 140, Pa.R.Crim.P. In keeping with the rationale behind *Ellis* and *Funk*, we find that as the right to counsel has not been applied to the taking of physical evidence, a greater than six hour delay in advising of the right to counsel, does not require physical evidence taken from a defendant to be suppressed.

## II The Expert Testimony

Over the objection of appellant and after an extended examination of their qualifications on voir dire outside the presence of the jury, Judge Ridge permitted the prosecution to put in the testimony of four expert witnesses, as follows:

Dr. Michael N. Sobel, a dentist specializing in orthodontics, and forensic odontology employed from time to time as a consultant and expert on dental problems, bite marks and related topics;

Dr. Robert Levine, a criminalist employed by the Allegheny County Crime Laboratory, with considerable experience in making comparisons of tool-marks and firearm-related marks;

Dr. Lowell J. Levine, from New York, a dentist specializing in forensic odontology; and

Dr. Homer Richardson Campbell, Jr., a dentist and Board certified specialist in forensic odontology for the State of New Mexico, with experience in bite-mark cases.

Scratch marks were found on the back of Lloyd Weston's body near the base of the neck. Dr. Sobel made an impression or cast of one of those scratch marks, using a compound of the same general type as dentists use in making impressions of teeth. He then compared that impression with an impression made from the nail on appellant's fourth (left) finger, using among other things, a comparison microscope. On the basis of these comparisons he testified that: "it was highly likely that the nail of the fourth finger, left hand, of Bennie Graves had made the mark in the neck of Lloyd Weston, Jr." (N.T., p. 1180)

Dr. Robert Levine, characterizing a fingernail mark in the skin as "a tool mark" (N.T., p. 1260), based upon an examination of the impression made by Dr. Sobel, and of a wax impression of appellant's left little finger,[2] again using the comparison microscope concluded that: "the fingernail impression as seen on the wax mold had the same class characteristics as the fingernail." (N.T., p. 1275). He testified further that "there is probably a fair degree of probability that this nail or any nail of this shape made this kind of mark...." (N.T., p. 1279) Over appellant's objection, he was later permitted to say that "this would be one (case) of high probability." (N.T., p. 1286), although the nail could not be characterized as "unique". (N.T., p. 1287)

Dr. Lowell J. Levine testified based upon his examination of finger nail clippings, photographs, slides and Dr. Sobel's impression, testified to a "fractured edge" on the impression of appellant's finger nail, and to his opinion that "it is highly probable" that appellant's finger nails made the mark on the neck of Lloyd Weston, Jr. (N.T., p. 1368); and that it was "very unlikely" that "some person other than Bennie Graves ... made these marks." (N.T., p. 1371)

Dr. H.R. Campbell, Jr. utilizing photographs and slides of the decedent's body and finger nail clippings of appellant, testified to his opinion "that the left-little finger and the left-ring finger (of appellant) were consistent with the inju-

2. The impression of the left little finger showed a "fracture edge", or "tear edge", according to the witnesses, which formed "a unique surface" "or unique edge". (N.T., p. 1274).

ry patterns shown in the photographs" of the deceased (N.T., p. 1440); that there was "a high degree of certainty in this case." (N.T., p. 1441); and finally that there was "[a]n extremely high degree of probability to the point of practical impossibility of finding two other nails on two fingers adjacent to each other that would make these marks." (N.T., p. 1448).

Appellant contends at the appellate level, as he did below, that the opinion testimony of these four doctors should not have been received.

The Commonwealth contends, as the court determined below, that the witnesses were "experts" in the broader field of "tool-marks"; that a finger nail and the impression it leaves, are analogous to "tool-marks"; and that the general procedures utilized in this case to make comparisons and draw conclusions, are the same as used in tool-mark identification. The Commonwealth contends the expert witnesses have special qualifications, as to which the jurors needed and were entitled to assistance in the form of expert testimony.

■ Appellant concedes that the initial question of whether a witness is qualified to testify as an expert lies within the sound discretion of the trial court and will not be overturned absent an abuse of that discretion. *Commonwealth v. Bennett*, 471 Pa. 419, 370 A.2d 373 (1977). He argues however that in this case: 1) none of the witnesses had the requisite special training, knowledge, and experience on the subject of finger nail identification, *Commonwealth v. Crawford*, 468 Pa. 565, 364 A.2d 660 (1976); 2) there is no scientific recognition of a method of identification through finger nails, *Frye v. United States*, 293 F. 1013 (D.C.1923); *People v. Marx*, 54 Cal.App.3d 100, 126 Cal.Rptr. 350 (1975) (a "bite-mark" case); *People v. Wesley*, 103 Mich.App. 240, 303 N.W.2d 194 (1981) and 3) there are no established minimum standards in this field. At first glance, it would appear that the identification of teeth marks comes more often within dentists usual field of knowledge than does the identification of finger nail scratchings. Nonetheless, the methods and techniques used

and evaluated in this present case,—the photographs; the casts of the wounds; the preparation of wax impressions of appellant's finger nails; the superimposing of images of the molds of the wound and the finger nail by use of comparison microscope—all were consistent with standards of general scientific acceptance in the field of tool-marks, of which, according to the witnesses, testimony as to finger nail wounds is a part. These were comparisons the witnesses were accustomed to make.

The current case is quite different from *Crawford*, supra, where the witness testified as an expert regarding the dating of finger prints only to later admit that such a procedure was not possible. Such testimony was held to be inadmissible. Here, while the comparison between scratch and nail may have been beyond the ability of the average juror, the witnesses had a "reasonable pretention to specialized knowledge" in making such comparisons. See: *Fady v. Danielson Construction Company*, 224 Pa. Superior Ct. 33, 39, 302 A.2d 405 (1973). See also *Haeberle v. Peterson*, 262 Pa. Superior Ct. 247, 250, 396 A.2d 738 (1978); and *Commonwealth v. Washington*, 235 Pa. Superior Ct. 339, 344 n. 1, 340 A.2d 896, 898 n. 1 (1975). These witnesses were qualified to testify as they did and it was for the jury, who had the enhanced comparisons before it, to determine what weight to give to such testimony.

■ We also agree with the lower court that this area is one which is scientifically recognized. Wound marks here referred to as tool marks, whether made by a firearm, knife, blunt instrument or finger nails, are a proper area in which experts may assist juries. Our attention has been invited to *Commonwealth v. Topa*, 471 Pa. 223, 369 A.2d 1277 (1977), where our Supreme Court granted a new trial after a conviction for murder. In that case, the trial court admitted opinion testimony of an expert concerning spectography, or voice print analyses. In the *Topa* case, Chief Justice Jones quoted *Frye*, reading in part, that:

"while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is

made must be sufficiently established to have gained general acceptance in the particular field in which it belongs. *Frye v. U.S.*, 54 App.D.C. 46, 293 F. 1013, 1014 (1923)."

Id., 471 Pa. at 231, 369 A.2d 1277.

More recently the Pennsylvania Supreme Court has found refreshing recollection by hypnosis has not gained sufficient acceptance in the scientific or legal community. *Commonwealth v. Nazarovitch*, 496 Pa. 97, 436 A.2d 170 (1981).

Appellant has overlooked a subtle, but very important distinction. In *Topa*, supra, the heart of the controversy was whether a person's voice recorded by a mechanical device was so distinguishable that it would allow one to identify its owner. Here the question *is not*, given a certain finger nail, whether its owner could be identified, *but instead* given a certain scratch and a known finger nail(s), can it be determined to a certain degree of probability that the nail caused the scratch. To demonstrate this distinction, we will review two cases from other jurisdictions upon which appellant relies.

*People v. Marx*, supra, involved a situation similar to the present, except the wound consisted of teeth marks and not scratches. The authorities had a victim with a bite-mark and a suspect whose teeth matched the bite mark. Both the bite mark and the suspect's dentition reflected the same irregularity. The court noted that whether the specific technique of comparison was generally accepted or recognized was not determinative of the admissibility. The witnesses relied upon approved, established, scientific techniques (similar to those used here) to solve a particular problem, which though novel, was well within the capability of the techniques employed.

In contrast is *People v. Wesley*, supra, there the court found that finger nail identification was not scientifically recognized and was therefore inadmissible. The investigating authorities found a finger nail during the course of their investigation. Samples taken from a suspect were compared with the nail found in the investigation, much in the

same manner as finger prints or hair samples are compared. The court found an absence of recognition and acceptance of finger nail identification in the forensic community. The court was dissatisfied that given a finger nail the experts could determine who it belonged to.

The distinction we draw here is as follows: in the *Marx,* supra, situation we are not dealing with an attempt to identify an individual based on some of his personal characteristics as the case was in *Wesley,* instead we have a wound, which the Commonwealth refers to as a "tool mark" and we have a suspected weapon (here a finger nail) and we wish to know the probability that the suspected weapon inflicted the injury. To relate this to Pennsylvania law, we need only to look at a few cases.

In *Topa,* supra, the accuracy of a voice print identification was questioned. There the Commonwealth claimed that given a voice print it could be determined that a certain individual made the recording. The Supreme Court was unwilling to accept this premise. While, in other situations, testimony as to size and shape of a wound in the body and the likeness of the thing causing the wound is frequently admitted to demonstrate that a suspect used a certain method in perpetrating a crime. *Commonwealth v. Hoyle,* 274 Pa. Superior Ct. 220, 223, 418 A.2d 376 (1979) (screwdriver); *Commonwealth v. Oates,* 269 Pa. Superior Ct. 157, 409 A.2d 112 (1979) (knife). We find no reason to distinguish between a distinctive knife and an irregular finger nail. (See footnote 2, supra) Therefore, we find it unnecessary to resolve whether finger nail identification (which arose in *Wesley*) is generally recognized.

■■■ Appellant further complains that the prosecution was permitted to rehabilitate Dr. Robert Levine's testimony from "a fair degree of probability" (N.T. p. 1275) to "high probability" (N.T. p. 1286). The extent to which a party may cross examine its own witness lies generally within the discretion of the trial judge: *Commonwealth v. Barber,* 275 Pa. Superior Ct. 144, 418 A.2d 653 (1980); *Commonwealth v. Quartman,* 253 Pa. Superior Ct. 460, 385 A.2d 429 (1978). We find no abuse of discretion, and no demon-

stration of improper harm to appellant as the three other expert witnesses for the prosecution testified substantially as did the rehabilitated Dr. Robert Levine.

III. Sufficiency of Evidence to Sustain Conviction.

Recognizing the principle that the verdict winner is entitled to all reasonable inferences to its advantage from the evidence, *Commonwealth v. Fortune,* 456 Pa. 365, 318 A.2d 327 (1974), appellant argues, nevertheless, that all of the evidence of guilt presented in this case is circumstantial and insufficient to prove beyond a reasonable doubt that he is the individual who committed these two homicides.

■ Initially, we note that circumstantial evidence may be sufficient to establish, beyond a reasonable doubt a crime, and that the accused was responsible for the crime. *Commonwealth v. Crowson,* 488 Pa. 537, 412 A.2d 1363 (1979); *Commonwealth v. Simpson,* 436 Pa. 459, 260 A.2d 751 (1976). Here, the Commonwealth's evidence established the following.

■ The appellant had been caring for the victims on the night when they were strangled to death. At 4:45 A.M., Daniel Anderson left the Weston home, leaving appellant alone with the children. At 7:10 A.M., the victims were discovered dead by their mother; appellant was not on the premises. No one else had been seen entering the house between 4:45 A.M. and 7:10 A.M. After several calls, appellant was advised of the children's deaths. He claimed that he was forced to leave the house. A sample of appellant's pubic hair was found to be consistent with a hair found on the female victim. A bathrobe which appellant had been wearing earlier contained blood stains, consistent with the type of the female victim and inconsistent with appellant's type. Dried blood was found under the finger nails of the female victim (its type was not determinable); fresh scratches were found on appellant's upper body. Such scratches did not match appellant's girl friend's nails and she denied having made them. Scratch marks found on the male victim were consistent with the characteristics of appellant's finger nails.

We find that the evidence was sufficient beyond a reasonable doubt to show that appellant was responsible for the death of the two young victims. We must also inquire whether the Commonwealth proved the requisite intent for the killing of Lynette Weston, 18 Pa.C.S. § 2502(c) and for the premeditated killing of Lloyd Weston. Id. § 2502(a).

The evidence, as it differs between the two deaths does not appear to support the different verdicts: murder in the third degree (Lynette) and murder in the first degree (Lloyd). A jury's verdict, in a criminal case will not be set aside merely because it appears to be inconsistent with another verdict of the jurors. So long as the challenged verdict is supported by the evidence, we will not on review delve into the thought process of the jury. *Commonwealth v. Carter*, 444 Pa. 405, 282 A.2d 375 (1971); *Commonwealth v. Shaffer*, 279 Pa. Superior Ct. 18, 420 A.2d 722 (1980).

Murder of the third degree has been defined as "an unlawful killing with malice expressed or implied, but absent any specific intent to take a life." *Commonwealth v. Nan*, 473 Pa. 1, 9, 373 A.2d 449 (1977). As to the death of Lynette Weston, we find no need to expound on the facts already given; they clearly show the existence of malice.[3]

The conviction for murder of the first degree for the death of Lloyd Weston requires a little more discussion. The trial court, relying on *Commonwealth v. Ingram*, 440 Pa. 239, 270 A.2d 190 (1970), found the fact that the victim had been manually strangled to death, raised a presumption that the murder was both intentional and malicious. Appellant argues that the verdict was based on conjecture that the killing occurred to "silence a witness" who viewed the first crime.

---

**3.** "The classic definition of malice was expressed in *Commonwealth v. Drum*, 58 Pa. 9, 15 (1868), as 'not only a particular ill-will, but every case where there is wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty ....' See, *e.g., Commonwealth v. Polimeni*, [474 Pa. 430, 378 A.2d 1189 (1977) ] *supra; Commonwealth v. Coleman*, 455 Pa. 508, 318 A.2d 716 (1974)." *Commonwealth v. Myers*, 266 Pa. Superior Ct. 566, 572, 405 A.2d 1252, 1255 (1979).

 Where there is no direct or concrete evidence of a specific intent to kill the fact-finder must look to the act itself and all the surrounding circumstances. *Commonwealth v. Meredith*, 490 Pa. 303, 416 A.2d 481 (1980); *Commonwealth v. Bundy*, 458 Pa. 240, 328 A.2d 517 (1974). It is the law of this Commonwealth that premeditation and deliberation may be found where there is a conscious effort to cause death; this design can be formed in a very short time. *Commonwealth v. O'Searo*, 466 Pa. 224, 352 A.2d 30 (1976). Where a deadly force is knowingly applied by a defendant to his victim, the intent to kill may be as evident as if the defendant had verbally announced his intent. *Meredith, supra. Meredith* offers special guidance to this case; there the defendant was convicted of the beating death of a two and one half (2½) year old child. On appeal, it was held that the number and severity of blows, the size and age of the victim permitted a finding that a deadly force had been applied to a vital part of the body and allowed the jury to infer an intent to kill. Likewise here, we believe the jury was entitled to find, where a ten year old child is strangled to death, the specific intent to kill required for a conviction for first degree murder.

Judgment of sentence affirmed.