DECISION
This is a civil action, in which the plaintiff, Town of Johnston, by its second amended verified complaint, asks the Court (1) to enjoin the defendants from excavating and doing site work in violation of a cease and desist order issued by the Town Building Official; (2) to enjoin the defendants from proceeding with construction under Town building permit #6221; (3) to compel the defendants to comply with the provisions of the Town Zoning Ordinance, the State building code and permit requirements necessary for the construction of a proposed asphalt plant; (4) to impose monetary penalties for continued violations of the zoning ordinance and building code; and (5) to impose fines and penalties for such violations pursuant to G.L. 1956 (1989Reenactment) § 23-27.3-122.3. The defendants deny any wrong-doing on their part. They assert a number of affirmative defenses and challenge the constitutionality of Town Ordinance No. 796, as well as the applicability of Chapter 22-B of the Town Code.
THE LAND
This case involves the activities of some of these defendants on land some of them own in the Town of Johnston. The whole parcel consists of several lots lying generally between Irons Avenue to the north, Endicott Street to the west, Sheridan Street to the south and the Woonasquatucket River to the east. The land was acquired in several stages. The easternmost portion of the land closest to the Woonasquatucket River was acquired by Carmine Pezza and his wife in 1956. That land is currently zoned industrial, as it has been since the first Town Zoning Ordinance was adopted. Carmine Pezza and his wife conveyed that land to the defendant C. Pezza Son, Inc., around 1971, when that corporation moved its business offices to the Irons Avenue location. The corporation was and is an excavating and site improvement contractor. As part of its business it excavates, transports and stores gravel, fill, loam and other such resources. It has engaged in crushing, screening and separation operations. The defendant Leonard Pezza is the current president and principal of the corporation. Excavation activity began on the Irons Avenue property promptly after it was acquired by Carmine Pezza.
In addition to the industrial land, Carmine Pezza in 1956 also acquired land in the northwesterly corner of the area presently involved in the intersection of Irons Avenue and Endicott Street. That land was conveyed to the corporation in 1975. It is currently zoned residential. In 1974 Leonard Pezza and Virginia Squizzero acquired title to a portion of the parcel bounded by Irons Avenue on the north and a paper street called Alpine Street to the east. This part of the land involved in this case is also zoned residential. Another portion of the residentially zoned part of the land was acquired by Leonard Pezza from other members of the extended Pezza family in 1984. The final contribution to what may now be called the Pezza's Irons Avenue land came in 1985 when the Town abandoned Alpine Street on the petition of Leonard Pezza and the other abutters.
The Court did not permit the plaintiff to impeach the acts of its own Town Council when it attempted to attack the validity of the ordinance of abandonment, by which the defendants acquired title to Alpine Street.
According to the testimony of Leonard Pezza, who has been personally associated with the business of C. Pezza Sons, Inc., since the 1950's, excavation began on the land now zoned residential, almost immediately after control was acquired. As to the lots owned by Pezza cousins he testified that excavation began even before title was formally acquired. Most of the excavation and removal of topsoil has long since been completed. Currently this westerly portion of the land has been used to store fill, or borrow, excavated from other locations. This stored fill, or topsoil, is then excavated, processed, and removed for use at other sites.
Aerial photographs, showing the land from an undetermined height, at an undetermined angle, with undetermined magnification, as interpreted by Mr. Mansuet Giusti, corroborates the testimony of Leonard Pezza in some respects and does not in other respects. Mr. Giusti was unable to perceive any excavation activity on an aerial photograph taken on April 6, 1965. (Plaintiff's Exhibit 8). This Court concludes that, just because the photo-interpreter was unable to detect signs of excavation on one day in 1965, it does not mean that excavation had not been carried on before and after that date. On his examination of a photo taken on April 11, 1975, (Plaintiff's Exhibit 9), he did note some excavation activity in the southeast corner of the property. He observed the removal of some topsoil and estimated excavation involving approximately twenty percent of the premises. By the time of the aerial photograph taken on April 13, 1981 (Plaintiff's Exhibit 10), excavation on the land is plain, even to an untrained eye, over a substantial portion of the land including the residentially-zoned areas east of Endicott Street. There are numerous parked vehicles and equipment on the easterly portion of the land near the building used by the corporation in its business. The 1992 photograph (Plaintiff's Exhibit 11) displayed increased excavation activity and somewhat reduced storage of vehicles and equipment since 1981. The increase in residential development in the area is also obvious from these Exhibits.
THE PROPOSED ASPHALT PLANT
The defendant Robert A. Pezza is Leonard Pezza's son. In 1993 he was vice-president of Material Sand Stone Corporation, a corporation owned by him, his brother Michael, and their mother. Leonard Pezza was apparently not connected with Material Sand 
Stone, Inc. Mr. C. Russell Hoffman was employed as operations manager of Material Sand Stone.
During the Summer of 1993 Robert Pezza became interested in building an asphalt plant on the Irons Avenue property as an adjunct to his own and other Pezza family enterprises. On July 13, 1993, Mr. Hoffman conferred with Anthony Izzo, the Town Building Official, to see what steps had to be taken to get approval to erect an asphalt plant on the Irons Avenue land. Mr. Izzo verified that the proposed site of the plant was zoned industrial. He then advised Mr. Hoffman that he would not issue a permit unless the State Department of Environmental Management (DEM) first issued its permission.
On April 27, 1994, DEM approved the installation of an asphalt batch plant to be located at 100 Irons Avenue in Johnston. The plant was to "consist of a Stansteel, Inc., Model TM-60, 200 TPH portable batch mix plant with a Stansteel baghouse." (Defendant's Exhibit A). Actually, two separate applications were approved: one for the plant itself and another for the baghouse. Both approvals were subject to extensive permit conditions and emission limitations. (Defendant's Exhibit A). One important limitation is: "The production rate of the batch mix plant shall not exceed 200 ton (sic) per hour."
The approval applications had been submitted to DEM on January 6, 1994 by an entity identified as Granite Asphalt Corp., signed by Robert Pezza, as president. At first during his testimony Robert Pezza thought that Material Sand Stone Corporation had applied to DEM. Granite Asphalt Corp. did not file its articles of association until November 22, 1994. (Plaintiff's Exhibit 25).
With the DEM approvals in hand, Mr. Hoffman returned to Mr. Izzo to ascertain what he needed to do to get the Town's approval to install the asphalt plant. He first obtained an approval from the Town fire chief. He then filed a formal application for a building permit in July 1994, but a problem of an arrears of taxes needed to be corrected. Whatever happened to that application the final application was dated November 23, 1994, the day after Granite Asphalt Corp. was formally incorporated. The notation "N/O Granite Asphalt Corp." is added to the entry identifying Leonard and Constance Pezza as owners of the land. (Plaintiff's Exhibit 2). This application appears to be signed by C. Russell Hoffman, who indicates an affiliation with Material Sand Stone Corp., for Leonard Pezza, who is identified as one of the owners of the land. (Plaintiff's Exhibit 2). It is undisputed that the application, except for signatures, was filled out by Mr. Izzo based on information furnished by Mr. Hoffman. The application shows that the work to be performed is: "Steel frame — Asphalt plant. Approved DEM #1295-1296 for Model TM-60, 200 TPH."
In addition, Mr. Hoffman prepared a document captioned: "Plan Showing Location of Proposed Portable Asphalt Plant on Irons Avenue, Johnston, R.I. December 15, 1993, Scale 1" = 50; C. Russell Hoffman, Surveyor." (Plaintiff's Exhibit 4). Mr. Hoffman acknowledged that he is neither a licensed engineer or surveyor. The plan also contains a note claiming that all land shown on the plan was owned by Granite Realty, which was then not completely accurate. Mr. Hoffman testified that he drew the plan at the request of Mr. Izzo. He simply copied the pertinent section of the assessor's plat and laid out the proposed location of the asphalt plant and surrounding paved areas. The fact that this plan bears the same date as the applications to DEM would tend to indicate that it was prepared for DEM, at least originally, and later filed with the Town Building Official. There is an indication, however, from the testimony of Mr. Gregory Smolley, the current Town Building and Zoning Official, that this plan was in the file of his office pertaining to the building application filed on November 23, 1994. Although Plaintiff's Exhibit 4 was never formally admitted as a full exhibit, it should be, and it is hereby received as a full exhibit.
Mr. Hoffman testified that there was some discussion by him with Mr. Izzo regarding the Town Industrial Performance Commission. He said that Mr. Izzo told him that the Commission was not active, but that with the DEM approval everything would be O.K. Mr. Izzo corroborated Mr. Hoffman's testimony when he testified that there was no need to submit the application to the Commission because the project had DEM approval. He regarded referral to the Industrial Performance Commission to be discretionary. The former Town Building Official also testified that he was not aware of Ordinance #796, adopted on August 9, 1989, which provided in part that "Prior to the application for a building permit for any industrial use, a site plan for the proposed use or structure shall be submitted to the Planning Board for review." He testified that he had never submitted one.
Apparently, according to the record, on June 5, 1990 the Planning Board did approve an application to construct a "steel frame wood-working factory with wood frame office building attached," prior to an application dated February 28, 1991. The record does not, however, disclose who submitted those plans to the Board. Otherwise, there is no record that the provisions of Ordinance #796 were ever complied with by any applicant or the building official. The Town explains that there were no other applications for "industrial" uses. According to Mr. Hoffman, the site plan he furnished to DEM was acceptable to Mr. Izzo. There is nothing in the record to show that the building official ever required compliance with Ordinance #796. It is undisputed also that the applicants never complied with the requirements of Ordinance #796.
In any event, the building permit was issued on November 28, 1994.
THE SITE DEVELOPMENT
Granite Asphalt Corp. began work on the proposed site of the asphalt plant between November 1994 and mid-April 1995. First, Granite Asphalt hired C. Pezza Son, Inc. to construct a concrete block retaining wall to south of the location of the asphalt plant parallel with Sheridan Street mostly on land zoned industrial. This retaining wall was not shown on any plan of the site for the plant.
In addition, C. Pezza Sons, Inc. began the construction of an earthern berm around portions of the residentially-zoned land. The berm extended along Endicott Street and Irons Avenue at a height of approximately twenty feet above the natural grade, with the top of the berm level with the top of the plant. The berm was constructed at the suggestion of DEM apparently to screen abutting residential neighbors from the sound generated by the asphalt plant. At the time work stopped, construction of the berms had not been completed. Like the retaining wall, the berms do not appear on any plan submitted by Granite Asphalt. The defendants have also installed footings for the erection of the plant with leave of the Court, to preserve their rights under the DEM approvals.
The evidence shows that Granite Asphalt has incurred expenses in excess of $50,000 to obtain its permits and to begin the site improvement necessary for the construction of the asphalt plant.
THE FIRST CEASE AND DESIST ORDER
On February 7, 1995, Mr. Gregory Smolley replaced Mr. Izzo as Town Building Official. Mr. Smolley received a number of inquiries about the site work carried on at the Irons Avenue location. He reviewed the materials on file in his office. He visited the site, which he observed from the street. In early April 1995 he took some photographs of activity on the premises. (Plaintiff's Exhibit 6). These photographs show excavation for footings for the asphalt plant in the area zoned industrial, and excavation, removal of fill and sifting taking place in the area zoned residential. Some photographs show the concrete block retaining wall and a portion of the berms.
On April 12, 1995, Mr. Smolley wrote to Mr. Leonard Pezza and Granite Asphalt Corp. He stated that his review of the files in his office disclosed a number of "shortcomings" regarding the permit dated November 23, 1994. There was some confusion arising from the fact that the DEM permit was addressed to Robert A. Pezza and Material Sand Stone Corporation, and not to Granite Asphalt Corporation or Leonard Pezza. The files failed to show a compliance with the Industrial Performance Standards section of the Town Zoning Ordinance. The site plan in the file was deemed inadequate. The official's site visit disclosed that work was going on other than in the permitted location.
For those reasons the Town rescinded the building permit and all work pursuant to the permit was ordered to cease. The defendants were given thirty days to answer and comply with the order.
In addition, the official notified the defendants that work they were doing in the residential violated the provisions of Chapter 22-B of the Town Charter. (Sic, but obviously referring to the Town Code). The addresses were ordered to cease and desist from "site work being undertaken on the area between Endicott Street and the area formerly known as Alpine Terrace (Street), as well as the construction of retaining walls along the property line at the end of Tyler Street." The defendants are alleged to have continued the work in violation of the April 12, 1995 order.
THE SECOND CEASE DESIST ORDER
In its second amended verified complaint, as allowed at hearing on September 6, 1995 and ordered on September 26, 1995, the plaintiff added Count III to his complaint alleging that he was authorized to revoke the November 28, 1994 building permit because the application and submitted materials contained false statements and representations of fact. The plaintiff purported to rely on G.L. 1956 (1989 Reenactment) § 23-27.3-114.6.
Accordingly, on August 11, 1995 he issued a "supplemental" letter of revocation of the permit specifying four grounds of revocation, one of which was stricken by the Court.
The plaintiff alleged that Item I, total cost: $300,000 on the application was false and that the defendants knew that the total cost of the installation of the plant was in excess of $800,000. He also averred that the model asphalt plant they proposed to construct was a model RM-60, 240 tons per hour, and not a model TM-60, 200 tons per hour. Finally, he also complained that Item E, Proposed Use Non-Residential, checked at F-2, Factory (Low Hazard) was false, because the asphalt plant should have been checked at H, High Hazard.
THE PERMIT APPLICATION
The record is clear that it was Mr. Izzo who determined that the permitted use was classified Factory (Low Hazard), rather than High Hazard, and not Mr. Hoffman, or anyone else representing the defendants.
The nature and type of the asphalt plant described by and in connection with the application was subject to bitter and protracted dispute. The credibility of material witnesses was seriously challenged. The Court is required to sort through confusing documentary material and to weigh sometimes ambiguous and inconsistent testimony.
It is undisputed that Robert Pezza began to pursue an interest in developing an asphalt plant at the Irons Avenue location in the Summer of 1993. Mr. Pezza and Mr. Hoffman came to deal with Stansteel Asphalt Plant Products, of Longview, Texas, through Mr. Roger Lannon, a manufacturer's representative in the concrete, asphalt and aggregate industry. Stansteel was represented by Mr. Raeburn King. At the time, Mr. Pezza was interested in a portable plant and Stansteel had immediately available a TM-40 plant, which had been produced for another purchaser, who did not consummate the sale.
According to Mr. King, he tried to sell the TM-40 plant to Mr. Pezza, who he believed was representing Material Sand Stone Corporation at the time. The record is clear that "TM" means that the plant is trailer-mounted. The 40 indicates that it has a maximum production rate of 40,000 pounds, or 200 tons per hour, based on 4000 pound capacity and a 45-second mix cycle, and a normal production rate of 160 tons per hour. Although Stansteel provided technical specifications for the plant to Mr. Pezza, the sale was never consummated and the plant was sold to another customer.
There is no question but that originally Mr. Hoffman submitted plans and specifications for the TM-40 plant to DEM in 1993 (Plaintiff's Exhibits 26 and 27). There is likewise no question but that the plant initially reviewed by DEM was a TM-40. (Plaintiff's Exhibit 28). There is, however, no explanation in the record for a quotation from Stansteel to Material Sand and Stone for an RM-60 plant, with a 240 tons per hour production capacity dated July 23, 1993, (Plaintiff's Exhibit 24), while the defendants were still seeking approval of a TM-40. According to Mr. Hoffman the change from a TM-40 plant to an RM-60 was not disclosed to DEM until some time in March 1994, presumably after the receipt of the March 8, 1994 quotation from Stansteel for an RM-60, 240 tons per hour, plant. (Plaintiff's Exhibit 23).
There is no question but that the letter of approval from DEM approves the installation of a "Stansteel Inc. Model TM-60, 200 TPH portable batch mix plant with a Stansteel baghouse." (Defendants' Exhibit A). The record is clear that DEM never had anything before it which referred to an asphalt batch mix plant such as the one mentioned in the letter. The credible evidence is that Stansteel has not manufactured or sold a TM-60 since 1971. Although current promotional literature would indicate that TM models might be available in mixer sizes up to 6000 pounds, there is no reason not to believe Mr. King that the TM-40 is the largest size in production.
The defendants contend that DEM intended to approve a ModelRM-60, 240 TPH plant, and that the "TM" designation is in error, as is the word "portable." The plaintiff argues that in fact DEM was lead to approve an asphalt plant exactly as described. The evidence discloses that Stansteel regularly describes its TM line as "portable" or "transportable" and its RM line as "stationary." (Plaintiff's Exhibits 27, 31 and 32). The Court also accepts the defendants' argument that the maximum rated capacity of 240 tons per hour is an insubstantial variation from the 200 tons per hour rating, because the DEM permit expressly limits the actual operating rate to 200 tons per hour, whatever the maximum capacity of the plant may be. (Defendant's Exhibits A and E).
The Court finds that the testimony of Mr. Hoffman, that the letter A on the quotation number in the March 8, 1994 quotation from Stansteel suggests that the RM-60 model quoted is portable, is utterly incredible. While this testimonial lapse tends to weaken his testimony, the Court will not reject it completely. The Court does accept Mr. King's testimony that Stansteel's RM line is portable in the sense that it is manufactured and sold in pre-assembled modules which can be readily assembled and disassembled by purchasers for easy movement from one site to another or for re-sale.
What is clear from the record is that the transportability of the plant was not material to DEM's approvals. Their approval was obviously site-bound. Any effort by the permittee to move the plant and continue to operate at a different location with these approvals would most likely be greeted with grave disapprobation by DEM.
What is equally clear from the record, however, is that the operation of the plant was particularly material to the approvals. The DEM after all was concerned with emissions of pollutants into the air. The hourly production rate was obviously material. In the permit conditions and emission limitations DEM specified that "The production rate of the batch mix plant shallnot exceed 200 ton per hour."
The RM-60 has a maximum hourly production rate of 480,000 pounds (240 tons) per hour and a normal production rate of 360,000 pounds (180 tons per hour). (Defendants' Exhibit E). During examination by the Court Mr. King explained that the difference was due to turn-around time in loading new materials into the feed apparatus. Nevertheless, even at the maximum rate of 240 tons per hour the RM-60 will not exceed the rate of emissions allowed by the DEM permit. (Defendants' Exhibits A and E).
According to a memorandum from Mr. Ronald Marcaccio to Mr. Hoffman dated March 22 or 23, 1994, Mr. Marcaccio was in some doubt as to whether the approval letter should "indicate TM-40, 200 TPH plant." (Plaintiff's Exhibit 28). Obviously Mr. Hoffman must have communicated some information to Mr. Marcaccio at DEM that raised some doubt in Mr. Marcaccio's mind as to the specific model plant that was to be approved. How "TM-40, 200 TPH, portable batch mix plant," was converted to the non-existent "TM-60, 200 TPH portable batch mix plant," when the applicants wanted approval for an "RM-60, 240 TPH plant," will remain a mystery shrouded in the mists of bureaucratic mis-communication.
What is clear from the evidence is that the RM-60, 240 tons per hour, plant was just as worthy of approval as the TM-40, 200 tons per hour, plant, based on the emission potential of the RM-60 installation.
Also clear from the evidence is the fact that, although the building permit application submitted to Mr. Izzo described the asphalt plant as the non-existent TM-60, the drawings filed with application are clearly for an RM-60. It is difficult to find that Mr. Hoffman or Granite Asphalt intended to deceive Mr. Izzo as to the nature of the plant they intended to erect when the manufacturer's engineering drawings plainly described it as an RM-60. Common sense would dictate the conclusion that at this stage of the permitting process the defendants would scarcely seek local approval for a plant for which they did not have State approval.
Finally, aside from transportability, no difference has been shown between the RM-60, for which the building official had engineering drawings, and the non-existent TM-60, which is specified in the application. If a TM-60 satisfied DEM, according to Mr. Izzo, he was satisfied as to industrial performance standards. If the performance of an RM-60 is the same as that of a TM-60, the difference in model number makes no material difference in the permitting process. Both models require concrete footings under the mixing tower. Both require stationary baghouses. Both require paved service areas. Control houses or trailers are needed for both models. Utilities need to be installed for both models. (Plaintiff's Exhibits 5 and 26).
The evidence regarding the estimated cost of materials and labor in Item I of the building permit application is also confused and contradictory. The figures were filled in by Mr. Izzo from data provided by Mr. Hoffman. According to Mr. Hoffman he advised Mr. Izzo that he estimated the entire project would cost between $800,000 to $1,000,000, but Mr. Izzo was interested only in the costs of site preparation, foundations and footings, gas lines, electrical work and the like. According to Mr. Hoffman, the numbers actually used in Item I to arrive at the fees charged in Item O were Mr. Izzo's own figures. Mr. Hoffman's testimony is corroborated substantially by Mr. Izzo. Mr. Izzo testified that the plant was manufactured off-site. He says that he was not aware of the cost of the plant itself. He says he based the figures in Item I on the cost of the foundation, electrical work, installation of utilities and not the cost of the plant itself. His testimony suggests that it was his usual practice not to show an estimated cost of pre-fabricated buildings in the estimate on the application.
The validity of Mr. Izzo's position was impugned by the testimony of Mr. Joseph Cirillo, the State Building Commissioner. He affirmed that the cost of the building should have been included in the estimate. He felt that the entry of $300,000 was a material variation. He did testify, however, that a building official has considerable discretion in accepting estimates on an application because the official controls the issuance of a certificate of occupancy which can be withheld until the appropriate fee has been paid.
EQUITABLE ESTOPPEL
The evidence is virtually undisputed that the defendants relied entirely on the building official in preparing their application for a building permit. The official, himself, filled out the application. They told him whatever he wanted to know. They provided him with whatever plans or papers he requested. It appears from the evidence that the defendants relied completely on the building official for the conclusion that they had furnished all the information he required from them to issue the permit they needed to construct the asphalt plant.
The suggestion that the defendants were deliberately deceiving or misleading the building official simply doesn't make sense. From a land use perspective an asphalt plant is an asphalt plant, whether it is a TM-40, a TM-60 or an RM-60. There is no reason for the defendants to do anything but disclose to the building officer that the plant they wanted to erect is the one for which they gave him plans, as he requested, to wit: an RM-60. There was no reason for the defendants not to disclose the purchase price of the RM-60, if Mr. Izzo had wanted to know. Obviously, he was satisfied to know only the construction costs on the site necessary for installing the pre-fabricated structure. He may have been mistaken, even slipshod, but how were they to know?
The defendants disclosed to Mr. Izzo that they were constructing a berm to protect the surrounding residential neighborhood. It was scarcely something they could hide. In any event, given the nature of the Pezza business it would be easily removable, if the officer were so to order. The same is true of the retaining wall. It would seem to the Court that the building officer might well require the wall to be erected rather than to order it removed. After all, it was DEM's idea.
According to bills received in evidence, the defendants have begun construction and incurred expenses in excess of $50,000 in reliance on the representations of Mr. Izzo, the building official, and on his issuance of the building permit. (Defendant's Exhibit B).
TRAVEL OF THE LITIGATION
On April 18, 1995, the Town, through its solicitor commenced this civil action. It alleged that the building permit it issued on November 23, 1994 was unlawfully issued for failure to comply with Ordinance 796 and hence was void. Also, the complaint alleged that work was carried on in violation of Chapter 22-B of the Town Charter. Finally, the complaint adverts to some alleged irregularities in the permit application. A temporary restraining order was granted on April 24, 1995 and entered on May 2, 1995 restraining the defendants from excavating and doing site work on the real estate in question. The case was heard on preliminary injunction commencing May 18, 1995. There were continued hearings on May 26, June 6, June 28, July 6, 17, 19, 24 and 25, August 1, 2 and 3. On August 1, 1995, the plaintiff was first allowed to amend its complaint and hearing on the merits was consolidated and advanced to the hearing on preliminary injunction. The second amended complaint was filed on September 5, 1995, and hearings resumed on that date. Hearings were held on September 6, 13, 14, 19, 26 and 28. The defendants answered the second amended verified complaint on September 26, 1995. Hearings resumed on October 6 and 12. Final arguments were heard on November 3 and 8, 1995.
FINDINGS OF FACT A. Chapter 22-B of the Town Code:
1. The defendants have carried on their business activities on the land in question for many years prior to the adoption of Section 22-B of the Johnston Town Code in 1985.
2. Those business activities have included excavation, transportation and storage of earth and fill, as well as screening and mixing of dirt, fill and gravel.
3. Some of the soil cover of these lots has been removed for many years prior to the adoption of Section 22-B.
4. These same activities have been carried on by the defendants regularly through the years after the adoption of Section 22-B without complaint by any Town official until the notice from Gregory Smolley on April 12, 1995.
5. It is now impossible to tell what was "the natural terrain, topsoil or vegetative ground cover" upon this property, as referred to in Section 22B-2 of the Johnston Town Code, which is or was disturbed by the business activities of the defendants.
6. It is likewise impossible to tell what "natural" terrain, topsoil or vegetative ground cover is disturbed by the installed and proposed earthen berms and the concrete block retaining wall constructed on the site, ancillary to the installation of the asphalt plant.
7. Section 22B-13 defines "development project" as follows:
 "Any construction, reconstruction, demolition, or removal [of] structures, roadways, parking or other paved areas, utilities, or other similar facilities, including any action requiring a building permit by the town."
8. The evidence fails to show that the berms and retaining wall are such structures, roadways, parking or other paved areas, utilities, or other facilities similar to those described in the section, as are those referred to in Section 22-B.
9. The berms and the retaining wall are not shown by the evidence to be "buildings," for which a permit is required underG.L. 1956 (1989 Reenactment) § 23-27.3-113.1 (State Building Code).
10. The construction of the berms and retaining wall are not shown by the evidence to be "development projects," referred to in Section 22B-2 as "specific situations" to which the chapter is applicable.
11. The berms and retaining wall were shown by the evidence to be constructed at the suggestion of DEM as ancillary to the asphalt plant.
 B. Article VII. Industrial Performance Standards:
12. The Town Building Inspector is authorized to certify that a proposed industrial use or operation probably complies with the provisions of Article VII, Industrial Performance Standards, of the Town Zoning Ordinance.
13. Referral by the Town Building Inspector to the Town Industrial Performance Commission is discretionary and is not mandated by the Zoning Ordinance.
14. The Town Building Official in this case accepted the approval by DEM of the proposed asphalt plant as satisfactory to his implied finding of probable compliance with the provisions of Section 1.6 of Article VII.
 C. Town Ordinance Number 796:
15. Town Ordinance Number 796 was adopted in 1989.
16. That ordinance requires that a site plan for any proposed industrial use or structure be submitted to the Town Planning Board for review.
17. That requirement has been imposed only once in the 62 applications for industrial uses or structures since the adoption of the ordinance.
18. That requirement was not known to the former Town Building Official at the time of the application in this case.
19. The failure to satisfy the requirements Ordinance Number 796 was not raised in the current Town Building Official's first cease and desist order of April 12, 1995.
20. That cease and desist order refers only to Article VII, Industrial Performance Standards, and not at all to Article XIII, Supplemental Regulation of the Town Zoning Ordinance, as amended by Ordinance Number 796.
21. The defendants have not in fact complied with Ordinance Number 796.
22. Ordinance 796 contains no standards to be applied by the Planning Board for the acceptability of site plans.
 D. General Laws § 23-27.3-114.6:
23. The defendants never sought approval from DEM or the Town Building Official of plans to erect a Stansteel Model TM-60 asphalt plant.
24. The defendants were in fact, after March 5, 1994, seeking approval from DEM and the Town Building Official to erect a Stansteel Model RM-60 asphalt plant.
25. The designation "TM" in the DEM letter of approval and on the building permit application is an immaterial mistake.
26. That mistake can be readily corrected by substituting "RM" without cancelling the permit.
27. The variance in the estimated cost between the $300,000 shown in the application and the actual cost in excess of $800,000 for the plant alone, without site work and utilities connection is a material variance.
28. That variance may be easily remedied without revoking the permit.
29. The variance was not caused by any intentional misrepresentation by the defendants with any intent to mislead or deceive the Town Building Official.
30. The variance was in fact caused by the Town Building Official's lack of awareness of the proper method of cost estimating pre-fabricated buildings.
 E. Equitable Estoppel:
31. The former Town Building Official affirmatively advised the defendants as to what information and documentation he would require to issue a building permit for an asphalt mixing plant.
32. The site plan furnished by the defendants was precisely the site plan requested and accepted by the Town Building Official acting in his official capacity.
33. The defendants obtained approval from DEM, with operating conditions and limitations, which the Town Building Official represented affirmatively satisfied his authority to require compliance with the Town's industrial performance standards.
34. The defendants were ready, willing and able to furnish the Town Building Official with a cost estimate of the plant, but he affirmatively represented to them that he was satisfied with an estimate of only a portion of the total costs associated with the installation of the plant.
35. The Town Building Official himself filled out the application and accepted the plans, drawings and DEM approvals submitted by the defendant and affirmatively represented that the information furnished to him was satisfactory to the issuance of the permit.
36. The Town Building Official issued a permit to the defendants to build an asphalt mixing plant, an affirmative official act within his official capacity.
37. The defendants relied on these official acts of the Town Building Official to begin site development of the erection of the asphalt mixing plant.
38. The defendants have incurred substantial expense and expended serious efforts in reliance on the official representations and acts of the Town Building Official.
39. It would be unjust to these defendants to revoke their building permit where they have relied to their detriment in good faith on the official acts, even if mistaken, of the Town Building Official.
LEGAL ANALYSIS
The plaintiff in this case properly invokes the jurisdiction of this Court under G.L. 1956 (1991 Reenactment) § 45-24-62 to enforce the zoning ordinances of the Town of Johnston and underG.L. 1956 (1989 Reenactment) § 23-27.3-122.2 to enforce the State Building Code and orders made pursuant to that code. The issues are whether or not the defendants have violated the Town's Zoning Ordinance or the State Building Code.
The Court can perceive no reason to invalidate the building permit because some of the pre-application activity of the corporate permittee preceded its formal incorporation. The applicant and permittee was in fact validly incorporated the day before the application was filed. See Katz v. Prete, 459 A.2d 81, 86 (R.I. 1983).
Although this Court has found as a matter of fact that the plaintiff has failed to prove that any of the activities of the defendants violates Chapter 22-B of the Town Code of Ordinances, some question as to the legality of that ordinance, as adopted, remains. The section was adopted pursuant to authority contained in Chapter 46, Soil Erosion and Sediment Control, of Title 45 of the General Laws. That Chapter of the General Laws contains several mandated provisions which have not been included in Chapter 22-B of the Town Code.
Section 45-46-4(a) requires that the ordinance contain "reasonable and prudent provisions for addressing soil and sediment control measures for existing uses and facilities, other than those exempt hereunder, including a reasonable time table for the submission of plans and documentation." The evidence was clear that the uses and facilities of the defendants on this land "existed" when the ordinance was adopted, but no provision for any "reasonable and prudent" control measures appear in Chapter 22-B.
Far more important, however, is the omission from Chapter 22-B of a provision in the required model ordinance set out in §45-46-4. In the mandated ordinance, in Article III, Section 1 (I)(a), the local building official is authorized to make a determination of the applicability of the ordinance. The model ordinance specifies: "A particular land disturbing activity shall not be subject to the requirements of this ordinance if the building official or his or her designee finds that erosion resulting from the land disturbing activity is insignificant and represents no threat to adjacent properties or the quality of any coastal feature or watercourse, as defined herein." Chapter 22-B fails to provide for any determination of its applicability by the Town Building Inspector.
The significance of that omission is readily apparent in this case where the Town Building Official never made any determination that any soil erosion caused by the defendants activity was significant enough to trigger the applicability of this ordinance. This omission raises serious questions about the legal validity of Chapter 22-B, which varies in some material respects from the mandated model ordinance. See State v. Krzak,97 R.I. 156, 160-61 (1964). According to § 45-46-7 the Town was required to bring its ordinance into conformance by July 1, 1991. The Town failed to do so through no fault of these defendants.
Ordinance Number 796, which amended Article XIII of the Town Zoning Ordinance is, on the other hand, a duly adopted amendment to that ordinance. That provision of the zoning ordinance does require the filing of site plans with the Town Planning Board for review as a pre-condition of filing a building permit application with the Town Building Official. As the Court has found, however, the ordinance does not specify the objective of the Board's review. In the absence of specification the only logical objective of the Board's review must be limited to determining the completeness and accuracy of the plans. Nothing in Ordinance No. 796 suggests that the Board is to decide whether the site plans comply with any substantive regulation of land use other than those specifically within the jurisdiction of the Planning Board.
Any other construction implicates serious constitutional questions of vagueness and standard-less referral of a legislative function. A.J.C. Enterprises, Inc. v. Pastore,473 A.2d 269, 274 (R.I. 1984).
Because the provisions of Ordinance Number 796 appear to be purely procedural, and since they have been ignored, except for one instance, since they were adopted, it seems to the Court that revocation of the permit is too drastic a remedy for non-compliance in this case. The site plans described in the ordinance are relatively simple to produce and can be prepared without unreasonably delaying the construction of the asphalt plant and putting it in operation. The plaintiff, itself, did not rely on Ordinance Number 796 in its original order nor in the complaint as originally filed in this case.
A Town Planning Board or commission is charged by §45-22-7(d) as follows:
 "A planning board or commission shall perform such other duties as may be assigned to the board or commission from time to time by any act of the general assembly or by any ordinance, code, regulation order, or resolution of the city or town council or by the appointing authority."
Notwithstanding the broad generality of that statutory empowerment, the role of local planning commissions and boards, prior to the enactment of the Rhode Island Zoning Enabling Act of 1991 (§§ 45-24-27 through — 72, inclusive, as amended by P.L.1991, ch. 307), with respect to zoning was advisory and not regulatory. See Sweetman v. Town of Cumberland, 117 R.I. 134, 147-49, 369 A.2d 1277 (1976). Cf Shalvey v. Zoning Board ofWarwick, 99 R.I. 692, 701, 210 A.2d 589 (Decided before the enactment of § 45-22-7(d)).
Sight must not be lost of the inescapable fact that the defendants' asphalt mixing plant is a legally permitted use where it is proposed to be built. The plaintiff has raised no objection, as a matter of substance, to the plant, itself. All of the plaintiff's objections refer to procedural discrepancies. Eventually, the defendants must be permitted to build an asphalt plant on the site in question, even if the plaintiff were to be successful in this lawsuit.
The Town has failed to satisfy its burden of proof that the building permit, as issued, is based on false representations of material facts. The defendants propose to build exactly what they told the former Building Official they wanted to build. Of course, if the current Building Official wants more information about the building, as built, before he issues his certificate of occupancy under G.L. § 23-27.3-120.1, he will be entitled to reasonable satisfaction of the provisions of §§ 23-27.3-113.5 and23-27.3-113.6. Section 23-27.3-114.6 does not authorize the revocation of permits which may be inaccurate or incomplete for lack of supporting documents, where the inaccuracies and incompleteness are at least equally the fault of the Building Official as the applicant.
The doctrine of estoppel applies against public agencies in an appropriate context to prevent injustice and fraud where public officers, acting within their authority, make representations to cause a party seeking to invoke the doctrine to act in a particular manner to that party's detriment. Ferrelliv. Department of Employment Security, 106 R.I. 588, 594,261 A.2d 906 (1970). Even before the Ferrelli, decision the Supreme Court had applied equitable doctrines to immunize landowners who held lawfully issued building permits from zoning changes adopted after the permits had issued. Tantimonaco v. Zoning Board ofReview of Johnston, 100 R.I. 615, 618-21, 218 A.2d 480 (1965);Shalvey v. Zoning Board of Review of Warwick, 99 R.I. 692, 699,210 A.2d 589 (1965). In Greenwich Bay Yacht Basin Associates v.Brown, 537 A.2d 988, 991 (R.I. 1988) the doctrine was recently re-affirmed.
In this case the facts as found by the Court clearly support the application of the doctrine of estoppel to prevent the Town from invalidating the approval granted to the defendants to build an asphalt mixing plant on their premises.
CONCLUSIONS OF LAW
1. The provisions of Section 22-B of the Town Code do not apply to any of the defendants' activities on the subject property.
2. None of the activities of any of the defendants alleged to violate said Section 22 B is grounds to revoke or rescind the building permit to construct an asphalt mixing plant issued by the Town Building Official.
3. The failure of the defendants to comply with Ordinance Number 796 can not be the basis for enforcement of the Town's cease and desist orders.
4. The failure of the defendants to comply with Ordinance Number 796 is not sufficient grounds to revoke the building permit.
5. Ordinance Number 796 is directory only and not mandatory, because it does not provide that non-compliance is a cause for revoking a building permit, and because it does not impose any substantive regulatory requirements.
6. The requirements of Article VII, Industrial Performance Standards, of the Zoning Ordinance have been validly waived by the Town Building Official pursuant to the ordinance.
7. The building permit was not based on false statements of facts or misrepresentations, and may not be revoked pursuant toG.L. 1956 (Reenactment of 1989) § 23-27.3-114.6.
8. The plaintiff is equitably estopped to deny the validity of the building permit it issued to the defendants.
CONCLUSION
Based on the foregoing findings and conclusions, the plaintiff's complaint will be denied and dismissed. The restraining order heretofore entered will be vacated.
Final judgment will enter for the defendants.
The defendants may submit a final judgment for entry upon reasonable notice to the plaintiff.