**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MARLENE R. WESOLOWSKY | |
| Appellant | No. 828 WDA 2014 |

Appeal from the Judgment of Sentence May 12, 2014
In the Court of Common Pleas of Fayette County
Criminal Division at No(s): CP-26-CR-0000304-2013

BEFORE:  GANTMAN, P.J., JENKINS, J., and MUSMANNO, J.

MEMORANDUM BY JENKINS, J.:                    **FILED JANUARY 30, 2015**

In the course of administering the estate of her deceased mother, Marlene Wesolowsky ("Appellant") stole personal property that belonged in large part to her siblings, including an enormous baseball card collection, baseball memorabilia, jewelry, coins, dolls, knives and a fur coat.  A jury found Appellant guilty of theft by failure to make required disposition of funds[1] in excess of $2,000.00,[2] a third degree felony.[3] The trial court

---

[1] 18 Pa.C.S. § 3927(a).

[2] Verdict Slip, April 10, 2014 (Docket No. 23).

[3] 18 Pa.C.S. § 3903(a.1).

sentenced Appellant to 9-23 months' imprisonment and ordered her to make restitution in the amount of $177,351.00.[4]

In this direct appeal, we conclude that Appellant's claims of pretrial and trial errors are devoid of merit. With regard to Appellant's sentence, we conclude that recalculation of Appellant's restitution is necessary, because the record does not support the amount of restitution ordered by the trial court. Because recalculation of restitution might affect the court's sentencing scheme, we vacate Appellant's entire sentence and remand for a new sentencing hearing.

**I.**

**Pre-trial proceedings**. On November 16, 2012, Appellant was charged with theft by failure to make disposition of assets from the estate of her deceased mother, Rosemary Mehall ("Mother"). On March 21, 2013, the Commonwealth filed a one-count criminal information against Appellant.

On April 16, 2013, Appellant filed a petition for writ of habeas corpus seeking dismissal of this charge. In an opinion and order entered on January 16, 2014, the trial court granted this petition in part and denied it in part. The court determined that the Commonwealth failed to produce *prima*

---

[4] Appellant filed timely post-sentence motions challenging the amount of restitution which the trial court denied without a hearing. Appellant filed a timely notice of appeal, and both Appellant and the trial court complied with Pa.R.A.P. 1925.

*facie* evidence that Appellant stole various "estate" assets, such as "money, investments, stocks, bonds, etc." Opinion And Order Dated January 16, 2014, p. 5 (Docket No. 18). The court found, however, that the Commonwealth provided *prima facie* evidence that Appellant removed personal property from Mother's house that belonged to other heirs of the estate. *Id*., pp. 5-7.

On April 7, 2014, the calendar judge denied the Commonwealth's motion to amend the information to include the items of personalty removed from Mother's house. One day later, on April 8, 2014, the trial judge granted the Commonwealth's motion to amend the information to include these items. Order Amending Information, April 8, 2014 (Docket No. 25). Although the trial judge's order did not say so, it effectively overruled the calendar judge's order.

**Evidence adduced during trial**. On January 14, 2004, Mother died testate, naming her daughter, Appellant, as the Executrix of her Last Will and Testament. She bequeathed her estate equally to her six children and step-children, namely Appellant, Doreen Mahoney, Ernest Mehall, Ralene Debord, Michael Mehall, and Frank R. Mehall, Jr.[5] Trial Transcript ("Tr."), p. 21; Exhibit 1.

---

[5] We will refer to Appellant's siblings by their first names.

During her lifetime, Mother lived in a house in Hopwood, Pennsylvania. Tr. at 51-52. Following Mother's death, Appellant stole personal property from Mother's house which belonged to Michael, Ernest, Ralene and Mother's estate. We summarize each victim's loss below.

*Michael.* Beginning in childhood, and continuing for 25 years, Michael amassed a baseball card collection of well over 250,000 cards.[6] Tr. at 32-35. He often purchased baseball cards at yard sales, flea markets and card shows in Pennsylvania and Ohio. Tr. at 36-39. He learned how to value cards by using standard valuation guides, Tr. at 37, and he was familiar with the criteria for valuation, such as a card's scarcity and condition. Tr. at 37-38. He explained that a card is in "mint condition" when "all the corners are nice and sharp, rounded, and [without] creases." Tr. at 37. Classic cards never decline in value if their condition does not change, because "as time goes on, there's less of them available, so the value ascends as opposed to descends." Tr. at 46. Michael was "very, very selective" in purchasing cards and tried to obtain cards in mint condition. Tr. at 41.

Michael defined a set of baseball cards as "one single card from each player for that entire year. So there might be 700 cards in a set, and as a

---

[6] The exact number is unclear. At one point, he testified that the collection included approximately 300,000 cards. Tr. at 35. At another point, he stated that he filled up 50 boxes with 5,200 cards apiece, a total of 260,000 cards, and purchased other boxes of cards that he never opened. Tr. at 53. Nowhere in this appeal does Appellant contend that Michael's collection totaled less than 260,000 cards.

collector, what I was trying to do was to complete sets. . ." Tr. at 40. "Having an entire set [of] every single card from [a] particular year," he continued, "does make the entire set a little bit more valuable than each individual card separate." Tr. at 40.

Michael acquired price guides over the years to help him value cards. Tr. at 39. To value the cards stolen by Appellant, Michael used the Beckett Price Guide, a guide published every year, to calculate the value of particular cards and sets of cards. Tr. at 39-40, 42. Michael was unsure whether he used the 2008-09 Beckett Price Guide to value his cards or a Beckett Price Guide from another year close in time. Tr. at 39 ("the Beckett Price Guide was, I think it was 2008-09, somewhere in that area that I used that it was similar to these").

Based on Michael's extensive collection of baseball cards, his 25 years of actively buying cards, and his knowledge of their value, the trial court recognized him as an expert in the field of baseball card collection, including the buying and selling of baseball cards.[7] Tr. at 44-45.

In 2012, when the police filed criminal charges against Appellant, Michael compiled a list valuing his cards. Tr. at 46. Michael testified that his entire collection was worth $146,805.00. Tr. at 51. He owned nine

---

[7] This ruling did not extend to the number of baseball cards in Michael's collection, since this was purely an issue of fact.

complete sets of cards from years 1963 and 1968-1975 (approximately 6300 cards, given his testimony that there are approximately 700 cards in each set). Tr. at 47. The aggregate value of these sets was $19,700.00.[8] Tr. at 47. Michael also owned 107 individual cards whose aggregate value was $74,055.00.[9] Tr. at 48-51. The total value of the nine complete sets and 107 specific cards was $93,755.00. Tr. at 47-51.

Simple arithmetic shows that Michael appraised the remaining 250,000-plus cards at $53,050.00 ($146,805.00 minus $93,755.00). He did not explain how he arrived at this amount.

The last time Michael saw his baseball card collection was when he visited the basement of Mother's house on the day of Mother's viewing. Tr. at 51-52. On that date, he observed his card collection organized in 50 boxes containing 5,200 cards apiece. Tr. at 52-54.

Within weeks of Mother's death, Appellant changed the locks on the residence and excluded her siblings from the home. Tr. at 55-56. Three

_____

[8] The value of each set was as follows: $6,000.00 (1963), $3,000.00 (1968), $2,800.00 (1969), $2,000.00 (1970), $2,500.00 (1971), $1,500.00 (1972), $700.00 (1973), $600.00 (1974) and $600.00 (1975). Tr. at 47.

[9] Michael specifically stated the value of each of the 107 cards. Tr. at 48-51. Most of these cards were from the 1950's, 1960's and 1970's (e.g., a 1955 Jackie Robinson ($500.00), a 1964 Mickey Mantle ($500.00), a 1967 Willie Mays ($100.00), a 1971 Nolan Ryan ($150.00)). Tr. at 48-50. Several were from the 1930's. Tr. at 50. Several "extremely rare", "thin and long" cards were from 1909. *Id*. His most valuable card was a 1952 Eddie Matthews (approximately $10,000.00). Tr. at 51.

years later, in August 2007, Appellant permitted Michael, Ralene, and Doreen to enter Mother's residence. Tr. at 56-57. Inside, Appellant angrily confronted Michael, stating he had to "be a big shit and [... get] a lawyer." Tr. at 57. Michael responded that "we tried everything we could to. . .get you to talk with us. We wrote you letters." Tr. at 57. He stated that his purpose was to get his cards and things and let the court decide. Tr. at 57. Appellant replied: "Those cards weren't yours anymore. They're part of the estate now, and if I want to, I can take them up to the garden and burn them." Tr. at 58, 127, 213.[10] Michael then retrieved some cards from the attic which did not include any of his valuable cards. Tr. at 58. Appellant refused to permit him to enter the basement, stating that the door was locked and she was the only one with a key. Tr. at 59.

On November 17, 2007, Appellant granted Michael, Frank, Ralene DeBord and Doreen access to the basement. Tr. at 60-61. The baseball card collection was not there, and the shelves that formerly contained the collection were empty. Tr. at 61-65, 215-216. Michael's other personal belongings were not in his old bedroom. Tr. at 61-65; Exhibits 4-7.

---

[10] Michael, Ralene and Doreen all testified that Appellant made this statement. Tr. at 58, 127, 213. Similarly, Ernest testified that Appellant cursed at Michael, called him names, and said: "You're not getting into that basement. I have the only key to that basement, and before you get your cards, I will burn them." Tr. at 110.

Appellant never returned his card collection to him. Tr. at 82-83. The cards have never been accounted for. Tr. at 217.

*Ernest*. Ernest owned an autographed baseball bat and ball of Roberto Clemente which he received at age seven from the legendary baseball player himself. Tr. at 104-106. Ernest kept the bat and ball in Mother's home and saw them in the home shortly before her death. Tr. at 107. Ernest looked for the bat and ball in the house after Mother's death, but they were no longer there. Tr. at 115-116.

*Ralene*. Prior to Mother's death, Ralene and Appellant were "pretty close." Tr. at 214. Ralene named Appellant godmother to her child. Tr. at 214.

Ralene testified that Mother and Father would purchase dolls for her wherever they traveled, including Zapf dolls, original porcelain cabbage patch dolls, and Barbie dolls. Tr. at 204.

In the spring of 2004, following Mother's death, Appellant asked Ralene to remove a table and grandfather clock[11] out of Mother's home. Tr. at 209. Ralene rented a Ryder truck and drove from her home in Boston, Massachusetts to Hopwood, Pennsylvania. Tr. at 209-210. Appellant met her at Mother's home and opened the front door with a key. Tr. at 209-210. Ralene asked Appellant if she could have her doll collection, and Appellant

_____

[11] The table and grandfather clock are not at issue in this case.

said: "I don't have time for that now." Tr. at 211. At that point, Appellant stood at the foot of the steps and started counting: "You have ten minutes, you have nine minutes, you have eight minutes, you have seven minutes..." Tr. at 211. When time expired, Appellant said: "That's all you can have. That's all I told you to come here and get. We're not doing the dolls now." Tr. at 211. Appellant locked the door to Mother's house while Ralene loaded her truck and left. Tr. at 211.

In August 2007, Ralene and her siblings met Appellant at Mother's house. Tr. at 213. Ralene pressed Appellant again for her dolls. Tr. at 214. Appellant replied: "I don't have the key [to the basement door] with me today. We're not getting in there today, and no, you can't have your dolls." Tr. at 214. When Ralene next returned to the home in November 2007, her doll collection was gone. Tr. at 215. It has never been accounted for. Tr. at 217.

*Mother's estate*. Mother had jewelry, knife and coin collections and a fur coat. Upon her death, this property became part of Mother's estate and should have been distributed in equal shares to her heirs.

Mother kept her jewelry collection in a large armoire in her bedroom. Tr. at 69, 75, 207-08. After Mother's death, Doreen observed Appellant emptying the contents of the jewelry armoire into a tote and saying: "I'm taking all of this." Tr. at 125. On November 20, 2007, the armoire and a

tote on top of the armoire were empty. Tr. at 75-78. The jewelry has never been accounted for. Tr. at 217.

Michael testified that Father (Mother's husband)[12] had a knife collection. Tr. at 69. Ralene testified that she collected knives for Father and would purchase knives for Father's Day, Christmas, his birthday, and any special occasion. Tr. at 195-198. Appellant provided four knives after Mother's death, but over twenty were unaccounted for. Tr. at 198-199, 217.

Father had a substantial coin collection that included Morgan silver dollars and wheat pennies. Tr. at 69-71, 114-115, 199. During trial, Ralene identified a bag of coins as comprising part, but not all, of Father's coin collection. Tr. at 199-201.

Mother wore her fur coat to Christmas Mass every year. Tr. at 68. Ralene testified that she wore the fur coat to Mother's funeral but returned it to the coat closet in Mother's house after the funeral. Tr. at 206-207. The coat was gone when Michael and his siblings visited the house on November 20, 2007. Tr. at 72-73, 77-78. The fur coat has never been accounted for. Tr. at 217.

_____

[12] Father died in 1999, five years before Mother died. Exhibit 11, Schedule A. The record does not describe whether Father had a will or other estate plan or describe how Father's property was distributed after his death. The parties appear to proceed on the assumption that all of Father's property passed to Mother at Father's death and then became part of Mother's estate at her death.

Attorney Jason Adams, who drafted Mother's will shortly before her death, advised Appellant that she was responsible for the contents of the estate and should secure the property. Tr. at 148-150. The inventory of the estate that Appellant gave Mr. Adams did not list jewelry, a jewelry armoire, a fur coat, a baseball card collection, or an autographed Roberto Clemente ball and bat. Tr. at 151-52, 160; exhibit 11. The inventory identified coins found in a safety deposit box valued at $163.65 but did not identify a coin collection. Exhibit 11.

**Restitution hearing.** Appellant appeared for a restitution hearing nineteen days after the guilty verdict. Below is the evidence relating to each victim.

*Michael.* The trial court took judicial notice of Michael's expert opinion that his baseball card collection was worth $146,805.00. Restitution Hearing Transcript ("RH") at 2-3.

*Ernest.* Without objection, the trial court admitted Richard Bower as an expert witness in the valuation of autographed baseball collectibles, particularly the Roberto Clemente bat and ball. RH at 8. Bower testified that Ernest told him that the bat and ball were in near mint condition and very well kept. RH at 9. Bower took into account Ernest's description, his own research into leading sources on autographed memorabilia, and a letter from Bryce Bergen, owner of Sports Collectors Universe, Bower's former place of employment. RH at 9-11. Based on these sources, Bower

appraised the value of the autographed baseball at between $1,500.00 -- $1,800.00, and he leaned "closer to the higher end of that estimate due to the fact that we are in the Pittsburgh area, and if you were trying to replace that item, it would be a lot harder to do." RH at 10-11. Bower appraised the value of the bat at between $2,000.00 -- $2,500.00. RH at 11. He testified that autographed Clemente bats and balls are both "very hard to find and obtain," but autographed Clemente bats are scarcer, and thus worth more, than autographed Clemente balls. RH at 11.

*Ralene.* Ralene looked up the prices of her missing dolls on a website named valuation.com. RH at 31. She testified that she had 20 Zaph dolls, each of which have a minimum retail price today of $200.00; 2 original and 2 porcelain cabbage patch dolls, each of which have a minimum retail price today of $299.00; and 20 Gotz dolls, each of which have a minimum retail price today of $200.00. RH at 30-31. The total value of the doll collection was $9,286.00. *Id*.

*Mother's estate.* Ralene testified that she purchased the following gifts for Mother: a necklace ($600.00), an emerald ring (between $300.00 -- $400.00 in price) and gold earrings ($100.00). RH at 22-23. Mother purchased one gold and diamond clustered ring for $1,000.00 and at least three or four other clustered rings. RH at 23-24.

Ralene testified that 23 knives that she purchased for Father were still unaccounted for, and they ranged in price between $100.00 -- $200.00. RH

at 18-19.  The prosecutor added that eight knives were worth $200.00 and the rest were close in worth to $100.00.  RH at 32.

Based on her ownership of a fur coat worth $15,000.00 at the time of purchase, Ralene estimated that Mother's fur coat was worth at least $5,000.00.  RH at 25-27.

**Sentencing hearing.**  One week after the restitution hearing, the trial court sentenced Appellant to pay restitution of $177,351.00, including $146,805.00 to Michael, $3,900.00 to Ernest, $10,646.00 to Ralene and $16,000 to Mother's Estate.  Sentencing Hearing Transcript, May 8, 2014, p. 33.

**Appeal.**  Appellant raises four issues in this appeal, which we have re-ordered for ease of discussion:

> 1. Whether the trial court erred at the start of trial in this matter in permitting the Commonwealth's motion to amend the information which was previously denied by the Honorable Senior Judge Gerald Solomon?
>
> 2. Whether the [trial] court erred in limiting defense counsel's cross-examination of attorney Vincent Roskovensky on his findings in his report dated March 8, 2013 in a related Orphans' Court proceeding that [Appellant] had committed no wrongdoing in the administration of [Mother's] estate?
>
> 3. Whether the [trial] court erred in qualifying as an expert and allowing the testimony of Michael Mehall on the issue of the value of the baseball card collection?

4. Whether the [trial] court erred in denying [Appellant's] motion for modification of sentence on the issue of the restitution ordered in the amount of $177,351.00?

Brief for Appellant, p. 5 (revised to correct typographical errors).

## II.

We first address whether the trial court properly permitted the Commonwealth to amend its information to allege that Appellant stole items of personal property from Mother's house that belonged to other heirs of the estate. As stated above, the trial court overruled an order entered by the calendar judge one day earlier that denied the Commonwealth's motion to amend the information.

Pennsylvania Rule of Criminal Procedure 564 provides:

> The court may allow an information to be amended when there is a defect in form, the description of the offense(s), the description of any person or any property, or the date charged, provided the information as amended does not charge an additional or different offense. Upon amendment, the court may grant such postponement of trial or other relief as is necessary in the interests of justice.

Pa.R.Crim.P. 564. The purpose of this rule is to "ensure that a defendant is fully apprised of the charges, and to avoid prejudice by prohibiting the last minute addition of alleged criminal acts of which the defendant is uninformed." *Commonwealth v. Page*, 965 A.2d 1212, 1223–24 (Pa.Super.2009). When a challenge is raised to an amended information, the salient inquiry is

- 14 -

[w]hether the crimes specified in the original ... information involve the same basic elements and evolved out of the same factual situation as the crimes specified in the amended ... information. If so, then the defendant is deemed to have been placed on notice regarding his alleged criminal conduct. If, however, the amended provision alleges a different set of events, or defenses to the amended crime are materially different from the elements or defenses to the crime originally charged, such that the defendant would be prejudiced by the change, then the amendment is not permitted.

*Id*.

The trial court explained its rationale for overruling the calendar judge and permitting the Commonwealth to amend its information as follows:

This [c]ourt entered an [o]pinion and [o]rder on January 16, 2014 which denied the omnibus pre-trial [m]otion to [d]ismiss of Appellant as to all estate and non-estate items related to the tangible personal property of Doreen [], Ernest [], Frank [], Michael [], and Ralene [], such items being a baseball card collection, doll collection, coin collections, a fur coat, jewelry, a knife collection, an autographed Roberto Clemente baseball bat and ball, and various household items. On April 7, 2014, the Commonwealth moved to amend the information[] to conform with this [c]ourt's [o]rder of January 16, 2014. As per local rules, on the first day of Criminal Court Week in Fayette County, the Commonwealth is directed to present all motions to the plea judge assigned to the week. For the April 2014 criminal term, the Honorable Senior Judge Gerald R. Solomon was assigned as plea judge. A transcript of those proceedings reveals that the [m]otion to [a]mend [i]nformation was Judge Solomon's first encounter with the instant proceedings.

In reviewing a grant to amend an information, the [c]ourt will look to whether the appellant was fully apprised of the factual scenario which supports the

- 15 -

charges against him. Where the crimes specified in the original information involved the same basic elements and arose out of the same factual situation as the crime added by the amendment, the appellant is deemed to have been placed on notice regarding his alleged criminal conduct and no prejudice to defendant results. ***Commonwealth v. J.F.***, 800 A.2d 942, 945 (Pa.Super.2002).

In the present case, the crimes specified in the original and amended informations clearly involved the same basic elements and evolved out of the same factual situation. Appellant was apprised of the basis for the amendment as a result of this [c]ourt's [o]rder of January 16, 2014. Accordingly, this [c]ourt did not err in permitting the amendment of the informations.

Pa.R.A.P. 1925(b) Opinion, pp. 12-14. We agree with the trial court's analysis. We further observe that while one judge normally should not overrule a decision of another judge on the same court, there are several exceptions to this principle, such as "[when] the prior court's ruling [is] so palpably erroneous that reversal is almost certain on appeal." ***Commonwealth v. Viglione***, 842 A.2d 454, 464 (Pa.Super.2004) (*en banc*). The trial court held, in so many words, that the calendar judge's ruling was plainly erroneous due to the judge's lack of familiarity with the case. We agree that the calendar judge's ruling was erroneous, and that the trial court properly permitted the amendment to the information on the ground that Appellant knew for over two months that she would be tried for stealing the specified items of personalty from Mother's house.

In Appellant's second issue on appeal, she contends that the trial court erred by limiting defense counsel's cross-examination of attorney Vincent Roskovensky on his findings in a related Orphans' Court proceeding that Appellant committed no wrongdoing in the administration of Mother's estate.

In June 2012, the Orphans' Court Division of the Court of Common Pleas of Fayette County appointed Mr. Roskovensky to review objections raised during Orphans' Court proceedings pertaining to Mother's estate. Tr. at 187-188. During Appellant's criminal trial, the Commonwealth called Mr. Roskovensky as a fact witness to testify about knives and coins that he was entrusted with holding for Mother's estate. Tr. at 188-189. Appellant's attorney sought to question Mr. Roskovensky about the accuracy of Ralene's and Michael's accusations that Appellant misappropriated shares of Millenium Management and Anheuser Busch stock that belonged to Mother's estate. Tr. at 182-183. The trial court refused to permit this questioning because it involved a "totally collateral" issue. Tr. at 184. In addition, the trial court later explained that "Attorney Roskovensky was not qualified as an expert in the criminal trial of this Appellant, and accordingly, the [c]ourt would not permit any testimony regarding his opinion of Appellant's handling of [Mother's] estate." Pa.R.A.P. 1925(b) Opinion, p. 15.

We agree with both reasons provided by the trial court. The manner in which Appellant handled the stock shares has no bearing on whether she stole items of personal property from Mother's house. Moreover, the

- 17 -

Commonwealth did not attempt to qualify Mr. Roskovensky as an expert. He merely testified as a fact witness about the nature of coins and knives that he was entrusted with holding for Mother's estate. This testimony did not open the door for Appellant's attorney to seek his opinion on the propriety of Appellant's conduct vis-à-vis Mother's estate.

Appellant's third argument on appeal is an objection to the trial court's decision to permit Michael Mehall to testify as an expert witness on the value of his baseball card collection.

The purpose of expert testimony "is to assist in grasping complex issues not within the ordinary knowledge, intelligence and experience of the jury. Moreover, the admission of this testimony is a matter for the discretion of the trial court and should not be disturbed unless there is a clear abuse of discretion." **Commonwealth v. Zook**, 615 A.2d 1, 11 (Pa.1992).

"The standard for qualifying an expert witness is a liberal one: the witness need only have a reasonable pretension to specialized knowledge on a subject for which expert testimony is admissible." **Commonwealth v. Kinard**, 95 A.3d 279, 288 (Pa.Super.2014). "The witness' expertise may be based on practical, occupational, or other experiential training; it need not have been gained through academic training alone." **Id. See**, **e.g.**, **Commonwealth v. Ellis**, 510 A.2d 1253, 1257 (Pa.Super.1986) (Commonwealth expert witness was qualified to testify as to comparison of

defendant's sneaker prints to those found at crime scene, where expert had been employed by crime lab for over five years, and although academically trained as a chemist, also had experience in comparing tool marks, tool impressions, tire and shoe marks); *Gottfried v. American Can Co.*, 489 A.2d 222, 228 (Pa.Super.1985) (can manufacturer's expert witness was qualified to give opinion testimony in products liability action, where he had assisted in design and modification of containers manufactured by manufacturer, lectured regularly on can design to industry representatives, and participated regularly in providing supervision over design of containers); *Commonwealth v. Graves*, 456 A.2d 561, 566-67 (Pa.Super.1983) (witnesses were qualified, through considerable experience, to testify as experts on source of "tool marks," i.e., whether wound marks on victim were made by a firearm, knife, blunt instrument or finger nails).

Michael gained extensive knowledge of the value of baseball cards by collecting between 250,000 – 300,000 cards over 25 years of attending card sales in Pennsylvania and Ohio. He had detailed knowledge of factors that affect the value of baseball cards, such as their condition, their scarcity, and the desirability of owning full sets of cards. Due to his considerable experience and knowledge, the trial court acted within its discretion by recognizing him as an expert in the field of buying and selling baseball cards. *See Ellis*, *Gottfried*, *Graves*, *supra*.

Finally, we address the legality of Appellant's sentence to pay $177,351.00 in restitution to the victims of her theft. In criminal proceedings, an order of "restitution is not simply an award of damages, but, rather, a sentence." *Commonwealth v. C.L.*, 963 A.2d 489, 494 (Pa.Super.2008). An appeal from an order of restitution based upon a claim that a restitution order is unsupported by the record challenges the legality, rather than the discretionary aspects, of sentencing. *Commonwealth v. Redman*, 864 A.2d 566, 569 (Pa.Super.2004), *appeal denied,* 583 Pa. 661, 875 A.2d 1074 (2005). "The determination as to whether the trial court imposed an illegal sentence is a question of law; our standard of review in cases dealing with questions of law is plenary." *Commonwealth v. Hughes*, 986 A.2d 159, 160 (Pa.Super.2009).

The trial court has statutory authority to order restitution under 18 Pa.C.S. § 1106, which provides in pertinent part:

> **(a) General rule.** Upon conviction for any crime wherein property has been stolen, converted or otherwise unlawfully obtained or its value substantially decreased as a direct result of the crime, or wherein the victim suffered personal injury directly resulting from the crime, the offender shall be sentenced to make restitution in addition to the punishment prescribed therefore.
>
> * * *
>
> **(c) Mandatory restitution.**
>
> (1) The court shall order full restitution: (i) [r]egardless of the current financial resources of the defendant, so as to provide the victim with the fullest compensation for the loss.

* * *

**(h) Definitions.** As used in this section, the following words and phrases shall have the meanings given to them in this subsection:

* * *

**'Injury to property.'** Loss of real or personal property, including negotiable instruments, or decrease in its value, directly resulting from the crime.

* * *

**'Property.'** Any real or personal property, including currency and negotiable instruments of the victim.

* * *

**'Restitution.'** The return of the property of the victim or payments in cash or the equivalent thereof pursuant to an order of the court.

*Id*.

The purpose of restitution is to impress "upon the offender the loss he has caused and his responsibility to repair that loss as far as it is possible to do so." *Commonwealth v. Wood*, 446 A.2d 948, 950 (Pa.Super.1982). Nevertheless, the record must support the amount of the defendant's restitution; it cannot be speculative and cannot exceed "the loss or damages sustained as a direct result of defendant's criminal conduct." *Commonwealth v. Opperman*, 780 A.2d 714, 718 (Pa.Super.2001); *Commonwealth v. Dohner*, 725 A.2d 822, 824 (Pa.Super.1999).

The court may order the defendant to pay the replacement value of stolen or damaged property as restitution. ***Commonwealth v. Graham***, 949 A.2d 939, 944-45 (Pa.Super.2008), *reversed on different grounds*, 9 A.3d 196 (Pa.2010) (evidence in arson prosecution supported restitution award of over $300,000.00 to homeowner's insurer, despite evidence that policy's building coverage limits were $265,465.00; insurer's representative testified that policy provided building coverage of $265,465.00 plus 25% if home should be replaced in its entirety).

With these standards as foundation, we analyze the trial court's award of restitution to each victim.

*Michael.* The trial court ordered Appellant to pay $146,805.00, the amount he stated was the value of his entire baseball card collection. This determination was correct in part and erroneous in part.

Using a price guide, his customary means of appraising baseball cards, Michael valued his nine complete sets of cards as worth $19,700.00 and 107 individual cards as worth $74,055.00, yielding a total of $93,755.00. Although he appraised these cards approximately two years before trial, he observed that the value of baseball cards never diminishes as long as their condition remains the same. Given Michael's extensive experience in purchasing baseball cards, his knowledge of their worth, and the specificity of his testimony, the record supports an award of $93,755.00 in restitution for Michael's baseball cards.

On the other hand, Michael gave no explanation for valuing his remaining 250,000-plus cards at $53,030.00. Without any record support for this amount of restitution, we are constrained to remand for resentencing. **Commonwealth v. Deshong**, 850 A.2d 712 (Pa.Super.2004) (remand for resentencing necessary to correct improper procedures in calculation of restitution and to answer questions bearing upon amount of restitution and conditions of probation).

*Ernest*. The record supports the amount of restitution awarded to Ernest ($3,900.00). The Commonwealth's sports memorabilia expert appraised the value of the Roberto Clemente autographed baseball as between $1,500.00 -- $1,800.00 ("closer to the higher end of that estimate") and the value of the Roberto Clemente bat as between $2,000.00 -- $2,500.00. The amount awarded to Ernest fell within the aggregate range of these appraisals.

*Ralene*. Ralene's testimony concerning the retail value of her dolls established the replacement value of her doll collection as $9,286.00. The trial court, however, awarded her $10,646.00. We are unable to tell from the record why the trial court awarded Ralene more than $9,286.00. Thus, we must remand for resentencing. **Deshong**, **supra**.

*Mother's estate.* The court awarded $16,000.00 to Mother's estate without apportioning this amount between her jewelry collection, knife collection, coin collection or fur coat and explaining the basis for its

apportionment. Because we are unable to discern the court's reasons for this award, resentencing is necessary. **Deshong**, **supra**.

In short, the record supports $106,941.00 in restitution -- specifically, $93,755.00 awarded to Michael, $3,900.00 awarded to Ernest and $9,286.00 awarded to Ralene -- but there is insufficient basis in the record for the remaining restitution of $70,410.00. Since restitution is a major component of Appellant's sentence, our decision on the restitution issue arguably upsets the entire sentencing scheme. The appropriate remedy in this situation is to vacate Appellant's entire sentence and remand for resentencing on all facets of Appellant's sentence. **Commonwealth v. Goldhammer**, 517 A.2d 1280, 1283 (Pa.1986) ("when a disposition by an appellate court alters the sentencing scheme, the entire sentence should be vacated and the matter remanded for resentencing"); **Deshong**, **supra**, 850 A.2d at 716 (appellate court's determination that restitution order was illegal altered sentencing scheme of trial court, thus proper remedy was to vacate entire sentence and remand for resentencing; sentencing guidelines called for minimum of three months of incarceration, but trial court instead imposed 48 months of probation plus restitution and costs, restitution would likely be a significant amount given the insurance fraud crime involved, and appellate court could not be confident that trial court would have imposed probation without restitution).

Conviction affirmed.  Judgment of sentence vacated.  Case remanded for resentencing.  Jurisdiction relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 1/30/2015